**Steve McELROY and Fred Griesbach, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. A 93 CA 117SS.**

United States District Court,
W.D. Texas,
Austin Division.

Aug. 25, 1994.

William W. McNeal, Lockhart, TX, for plaintiffs.

Ernest C. Garcia, Mollie S. Crosby, U.S. Attorney's Office, and Mollie C. Nichols, Asst. U.S. Atty., Austin, TX, for defendant.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

SPARKS, District Judge.

BE IT REMEMBERED that on the 27th and 28th days of June 1994, the Court held a bench trial for adjudication of the above-captioned matter. Plaintiffs brought claims against the United States of America pursuant to 28 U.S.C. §§ 1346(b) and 2674 (or the Federal Tort Claims Act) for damages resulting from the alleged negligence of officers and agents of the Organized Crime and Drug Enforcement Task Force (hereinafter, "OC-DETF")—a federal task force composed of federal, state, and local law enforcement officers. In addition, or alternatively, Plaintiffs aver they were victimized by the officers' intentional torts. After the conclusion of the evidence and the arguments of counsel, the Court withheld ruling until the parties had an opportunity to submit additional post-trial briefs on the issue of the Defendants' liabili-

ty. Having considered the trial evidence, the oral arguments of counsel, and the post-trial briefs, the Court enters the following Findings of Fact and Conclusions of Law.

## I. Findings of Fact

In the fall of 1991, a confidential informant apprised agents of the OCDETF that George Rodriguez had sold him illegal narcotics. The informant had visited Rodriguez's residence at 6703 Comanche Trail in Travis County, Texas, and purchased drugs from him on several occasions. This information corroborated the OCDETF's suspicions that Rodriguez was a member of a large international drug distribution network which had been targeted in a sting operation. Consequently, members of the task force began watching Rodriguez's apartment in late October or early November of 1991. Officer Black, a local police officer who had been deputized as a federal agent, surveyed the activities at Rodriguez's apartment on twenty to thirty different occasions. In addition, the confidential informant had provided the task force with a description of the apartment's layout or floorplan.

In November of 1991, officers on the task force ran a check with the Texas Department of Motor Vehicles to determine the ownership of a Blue Suzuki Samurai that was often parked in front of Rodriguez's apartment. The check revealed that the automobile belonged to a person named Fred Griesbach who lived in Dallas. The officers then deduced Rodriguez's girlfriend, who resided in Dallas but visited him frequently, was either borrowing the car or had registered it under a different name.

The OCDETF officers did not attempt to check the utility records for Rodriguez's residence because they did not have direct access to the computers of the utility company, Perdinales Electric Company. Moreover, due to the small size of that company, the agents feared any inquiry by them would risk a leak to Rodriguez and, in turn, might jeopardize the entire sting operation. Finally, no pen registers were placed on the phone lines at the residence but the task force had pen registers monitoring the lines of Rodriguez's co-conspirators who contacted him regularly.

After accumulating enough evidence to establish probable cause to search the residence, the task force obtained a valid "no knock" search warrant from the United States Magistrate Judge. At approximately 6:00 a.m. on February 6, 1992, the task force (comprised of local police officers, federal D.E.A. agents, and the Travis County S.W.A.T. team) executed the warrant at 6703 Comanche Trail.[1] They rammed through the castle doors of Rodriguez's apartment and scattered throughout; some rushed to a bedroom where they seized Rodriguez and his female companion while others conducted a "protective sweep" to secure the area. During this protective sweep, one of the officers ran onto a balcony and, shining his light, observed an additional side of the building which the task force had yet to secure. He then informed the other officers of his discovery and, after realizing there were no internal doors connecting the two sides of the building, they ran outside and located another door that appeared to lead to the unsecured side. They then procured a battering ram and began splintering the second door.

Unfortunately and unbeknownst to the task force, the building was a duplex and the left side was occupied by two persons, Plaintiffs McElroy and Griesbach, who had no connection with the illegal activities of their neighbor Rodriguez. McElroy and Griesbach had lived at 6703 Comanche Trail since the commencement of the OCDETF's investigation.

McElroy awoke that morning to the terrifying sounds of crashing and screaming in Rodriguez's apartment next door. His first thought was that his neighbors were being murdered and he would have to get out of the duplex to save his own life. He looked down from the window of his bedroom loft and saw a flashlight shining from a balcony on Rodriguez's side of the duplex. He dialed 911 but before he could complete his call the

---

**1.** By mistake, the warrant listed 6705 Comanche Trail as the residence to be searched. Rodriguez was actually living at 6703 Comanche Trail and the officers had intended all along to search the residence at that address.

intruders began bashing in the front door of his unit. In an attempt to escape, he ran to the level below his bedroom loft and onto a balcony. He looked down from the balcony, which hung over a steep cliff, and reconsidered his escape route. He ran down the stairs to the ground floor where the front door was located. Before he could find a way to get out, the front door gave way and the Travis County S.W.A.T. team, outfitted in black suits, poured into the foyer and pounced on him. As they were taking him down, one of the officers grabbed for his head and inadvertently ripped out some of his artificially implanted hair. McElroy also sustained several small bruises and cuts on his legs. For approximately two minutes, they held him pinned to the floor with a gun to his head. To this point, the S.W.A.T. team had not identified themselves, but when McElroy, obviously terrified, implored them to identify themselves, they answered with nonresponsive obscenities.

Agents not involved in the take-down of McElroy ran past him toward Griesbach who, awakened by the commotion, had come to the base of the stairs on the ground floor. They tackled and pinned Griesbach in a similar manner, shouting obscenities, grabbing his hair, and holding a gun to his head. He received several bruises and a cut on his left shin. Like McElroy, none of Griesbach's cuts or bruises required medical attention.

After the initial siege, McElroy and Griesbach, wearing only boxer shorts, were secured with flexible plastic handcuffs and taken next door to Rodriguez's side of the duplex. The agents seated them on a couch next to Rodriguez and his girlfriend. Griesbach was given a bandage for the cut he sustained on his shin. After questioning McElroy and Griesbach for approximately forty-five minutes, the task force determined they were not involved in the drug-related activities of Rodriguez. The agents then took them back to their unit next door, required them to be photographed, issued a perfunctory, half-hearted apology, and released them. After they were released, no one from the OCDETF made any follow-up investigation to ensure that both men were not harmed (physically or mentally) or to assess the damages the raid caused to the apartment.[2]

## II. Conclusions of Law

■ McElroy and Griesbach contend the agents and officers of the OCDETF, in executing the above-described investigation and raid, acted negligently. Additionally and, perhaps, alternatively, they claim the officers committed intentional torts against them during the raid. They therefore believe they are entitled to damages under the Federal Tort Claims Act (hereinafter "FTCA"). It should also be noted that McElroy and Griesbach have not sued any agents or officers individually in a *Bivens* action, but strictly in their capacity as employees of the federal government.[3] Further, the Court cannot infer a *Bivens* action lies within the FTCA claims because liability under the FTCA arises only when state law would impose it and a *Bivens* action is based on violations of federal constitutional law. *Brown v. United States*, 653 F.2d 196, 201 (5th Cir. Unit A Aug. 1981), *cert. denied*, 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982); *White v. Franklin*, 637 F.Supp. 601, 613 (N.D.Miss. 1986).[4]

## ★ Negligence Under the FTCA

■ The Court concludes the OCDETF was negligent in its investigation prior to the raid. Officer Black, the officer supervising the investigation of Rodriguez, personally

2. The Court was particularly disturbed by this fact. The officers showed no contrition for their behavior. Officer Hildreth of the DEA testified they had no regrets for the way they conducted the investigation and raid, notwithstanding the fact that they injured innocent citizens and caused considerable property damage during the raid.

3. Despite this fact, Plaintiffs' pleadings liberally analogize to *Bivens* cases wherein federal agents and officers were found individually liable for their conduct.

4. Plaintiffs have also claimed the OCDETF's actions invaded their privacy in violation of the Fourth Amendment and amounted to cruel and unusual punishment under the Eighth Amendment. As will be seen below, the Court cannot address these constitutional torts under the FTCA.

participated in twenty to thirty stake-outs of the Comanche Trail residence before the raid. Several other officers also conducted surveillant activities which included taking aerial photos of the residence. With all this surveillance, however, no one ever saw Griesbach and McElroy leaving for work in the mornings or returning in the evenings, which they did routinely for over three months prior to the raid. They obviously entered and exited the building through a separate door than the one used by Rodriguez. Careful reconnaissance would have also revealed two separate meter boxes behind the building.[5] Finally, Officer Black, after determining the Suzuki Samurai in the driveway belonged to a Fred Griesbach, did nothing to investigate Griesbach. In all probability, such an investigation would have revealed his residence at 6705 Comanche Trail.[6]

Despite finding that the OCDETF was negligent in their investigation, the Court cannot conclude, from a preponderance of the evidence, that their negligence proximately caused the harm to Plaintiffs. Even assuming the OCDETF discovered 6703 Comanche Trail was a duplex and that other people lived in the unit adjoining Rodriguez's, the same damages would have likely resulted. The task force could not have determined that Rodriguez's neighbors were not involved in the drug trafficking ring without jeopardizing the entire sting operation. Of course, the Court does not mean to imply that police investigators should presume that neighbors of drug dealers are guilty by association. However, under the circumstances of this case, that presumption, though inaccurate, would not have been illogical.

The residence at 6703 Comanche Trail is an oddly-shaped structure located on a private road in a secluded area of Travis County. From the street, it does not look like a typical duplex and one could assume that its occupants, though technically residing at different addresses, have significant interaction and share certain common areas. The owner of the duplex lived in a large private home next door. The duplex and the home are in close proximity and share a swimming pool. The owner leased the duplex to his friends Rodriguez and Tom Capello on handshake deals. Capello, in turn, sub-leased his unit to Griesbach and McElroy later moved in to share the rent. Typically, police investigating apartment or duplex residents can question an owner or property manager. In this case, however, the OCDETF had reason to suspect the owner was also involved in the drug trafficking operation and questioning him was, therefore, not an option.[7] Hence, the only way to certify that Rodriguez's neighbors were not involved would have been to sequester and interrogate them personally. Such activity would risk a tip-off to Rodriguez and could have botched the entire sting operation because, simultaneous to the Rodriguez raid, the OCDETF had planned to execute searches or raids at approximately sixteen other locations throughout Texas.[8] One leak could have had a domino effect and notified all of Rodriguez's co-conspirators. For the aforementioned reasons, the Court cannot find from a preponderance of the evidence that the OCDETF's negligent investigation—i.e., its failure to discover that 6703 Comanche Trail was a duplex occupied by separate parties—proximately caused the injuries to Plaintiffs in this case.

■ It should also be made clear that the Court has determined the task force acted negligently in conducting its preliminary surveillance and not during its actual execution of the raid. With respect to the raid, proba-

---

5. Nevertheless, the Court accepts the explanations for failure to investigate the utility records for the residence. Because such inquiries would have jeopardized the success of the entire sting operation, it was reasonable to forego them.

6. Apparently, Griesbach listed his residence and mailing address as 6705 Comanche Trail instead of 6703 (the actual address of the duplex) to eliminate any intermingling of his mail with Rodriguez's. Even so, because the agents of the task force mistakenly believed Rodriguez resided at

6705 Comanche Trail, they would have concluded that Griesbach lived there as well.

7. The close proximity of the owner's home to the duplex and the fact that there was no formal lease agreement would have evidenced some relationship between Plaintiffs and the owner, thereby bolstering, not diminishing, the officers' suspicions about Plaintiffs' involvement.

8. *See* Exhibit G–3.

ble cause existed to enter Rodriguez's side of the duplex and the officers reacted reasonably upon discovering McElroy and Griesbach's side. To secure the area of all potential dangers, they had to break into McElroy and Griesbach's unit and take them into custody. The specific conduct of the officers during the raid, i.e. the tackling of the Plaintiffs and placing them in custody, was not negligent but intentional.[9]

■ Even assuming the Court found negligence *and* proximate cause regarding the task force's surveillance of the residence at 6703 Comanche Trail, whether their negligence is actionable under the FTCA requires further consideration. The FTCA does not waive the United States' sovereign immunity in all cases where the acts or omissions of a federal employee are challenged. In particular, if the complaint challenges the employee's performance of a discretionary function, 28 U.S.C. § 2680(a) exempts the United States from liability. The discretionary function exception applies regardless of whether the agency or employee exercised due care. *Buchanan v. United States,* 915 F.2d 969, 971 (5th Cir.1990). Thus, to recover damages for negligence under the FTCA, McElroy and Griesbach must allege the federal officers and agents were not exercising a discretionary function when they failed to ensure that Rodriguez was the only occupant of the residence at 6703 Comanche Trail.

■ In general, because it is the mandatory duty of law enforcement agents to enforce the law, decisions as to how to best fulfill that duty are protected by the discretionary function exception.[10] *Horta v. Sullivan,* 4 F.3d 2, 21 (1st Cir.1993). Even so, the courts should not accept this presumption without analyzing the specific facts of each

case. The Supreme Court set forth a method for such an analysis in *United States v. Gaubert. United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The *Gaubert* decision promulgates a two-pronged test to determine whether the FTCA's discretionary function exception applies. First, the reviewing court should determine that the challenged conduct involved an "element of judgment or choice." *Id.* at 319–320, 111 S.Ct. at 1272; *McNeily v. United States,* 6 F.3d 343, 348 (5th Cir.1993) (applying the *Gaubert* criteria); *see also Dalehite v. United States,* 346 U.S. 15, 35–36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953) (declaring that "where there is room for policy judgment and decision, there is discretion."). In other words, the court should determine that the conduct did not involve mandatory compliance with a particular "federal statute, regulation, or policy." *Id.* Second, if the challenged conduct involves the element of judgment or choice described in the first prong, the reviewing court should make certain the conduct is "based on considerations of public policy" before applying the exception. *Gaubert,* 499 U.S. at 323, 111 S.Ct. at 1274; *McNeily,* 6 F.3d at 348.[11]

■ As discussed above, the Plaintiffs' only valid negligence claims arise out of the task force's preliminary investigation and surveillance of Rodriguez's residence. Therefore, applying the *Gaubert* test, the Court must determine whether the planning and orchestration of a criminal investigation involves elements of judgment (or does not involve mandatory compliance with a particular "federal statute, regulation, or policy") and is based on public policy considerations.

The negligent acts or omissions of the federal agents and officers during the prelim-

---

9. The Court could infer that McElroy has argued the officers negligently ripped out his hair while tackling him or that Griesbach has contended they negligently caused him to cut on his shin. The undersigned finds that although the officers inadvertently caused these injuries, the injuries did not result from any negligence.

10. As expressed by Justice Warren in *Pierson v. Ray,* "[a] policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if

he does." *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967).

11. This second prong regards the fact that in creating the discretionary function exception, Congress sought to preclude judicial second-guessing of administrative decisions "grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984).

inary investigation of George Rodriguez were clearly guided by judgment and choices and not by any federal rule or policy. It was Officer Black's feeling that obtaining utility records for the Comanche Trail residence could jeopardize the entire sting operation. *See Georgia Casualty & Surety Co. v. United States,* 823 F.2d 260, 263 (8th Cir.1987) (determining that the FBI's decision to refrain from notifying third parties of an investigation out of concern for secrecy was protected under the discretionary function exception). He also believed further investigation of Fred Griesbach would not benefit the operation. On the morning of the raid, he was satisfied that the task force had adequate information to perform a safe and effective search of the premises. Similarly, Greg Hildreth, the DEA agent who supervised the investigation, testified he did not feel additional surveillance was necessary before the raid. Plaintiffs have proffered no evidence showing the acts or omissions that amounted to a negligent investigation involved anything other than the discretion of the supervising agents and officers. They have also failed to show that the acts or omissions were governed by an official rule or policy.[12]

With respect to the second prong of *Gaubert,* the Court finds that the discretion exercised by the task force while conducting the investigation was guided by public policy considerations. In making decisions related to the investigation, the agents and officers (specifically Agent Hildreth and Officer Black) were primarily concerned with obtaining evidence to convict Rodriguez. Their decisions to take or refrain from certain actions were controlled by their desire to obtain his conviction. Obviously, this objective correlates with the public policy goal of punishing and deterring distribution of illegal narcotics. Hence, the actions and omissions connected with the investigation satisfy both prongs of *Gaubert* and the discretionary function exception applies to exclude Plaintiff's negligence claim.[13] *See Flax v. United States,* 847 F.Supp. 1183, 1188 (D.N.J.1994) (finding that action against FBI agents for negligent surveillance of a kidnapping victim was barred by the discretionary function exception of the FTCA); *Mesa v. United States,* 837 F.Supp. 1210, 1212 (S.D.Fla.1993) (concluding that action against DEA agent for negligently investigating and arresting the wrong person was barred by the discretionary function exception); *Patel v. United States,* 806 F.Supp. 873, 878 (N.D.Cal.1992) (holding that DEA agents' decisions to investigate, obtain search warrant, and raid suspected drug hideout were discretionary functions).

★ **Intentional Torts Under the FTCA**

Plaintiffs have additionally claimed the actions of the officers during the raid amounted to intentional torts and are actionable under the FTCA. The intentional tort claim requires a slightly different analysis than the negligence claim. Section 2680(h) of the FTCA expressly waives sovereign immunity for the intentional torts of law enforcement and investigative officers. In fact, that section was designed to redress the precise intentional tort claims Plaintiffs have alleged in this lawsuit. The Fifth Circuit Court of Appeals assessed the congressional intent of 2680(h) as follows: "Congress, in response to 'no knock' raids conducted by federal narcotic agents on the wrong dwellings, passed the 1974 amendment to the Federal Torts Claims Act to provide compensation [for persons

---

**12.** Though there is some confusion as to which party bears the burden of proving the discretionary function exception, *Gaubert* implies the burden rests on the tort plaintiff to show why the conduct of the government agency or employee is not protected under the exception. *Autery v. United States,* 992 F.2d 1523, 1526, n. 6 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1829, 128 L.Ed.2d 458 (1994).

**13.** The Court should also mention the obvious underlying policy reasons for exempting the United States from actions in negligence arising out of the discretionary decisions of its law enforcement agents and officers. Were negligence actionable under these circumstances, law enforcement tactics would become hesitant, apprehensive, and less effective. In light of the rampant drug problem in this country, public policy assigns a high priority to the aggressive enforcement of the drug laws. Furthermore, by exempting negligence under these circumstances the Court does not sanction intentional police intrusions into the lives of innocent citizens. The Court is well aware of democratic peoples' aversion to that type of Orwellian or Kafkaesque police activity.

victimized by intentional torts].'' *Solomon v. United States*, 559 F.2d 309, 310 (5th Cir. 1977).

Section 2680(h) does not, however, trump the discretionary function exception of 2680(a). The exception will apply and the United States will remain immune if, from the face of the pleadings, the reviewing court can determine that the accused agent or officer was performing a discretionary function when he allegedly committed the intentional tort. *See Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir.1987). However, if the allegations indicate the agent or officer was not performing a discretionary function, he may be liable for the commission of intentional torts under section 2680(h).

As *Sutton v. United States* explains, ''[a] government agent who departs from the duties of an investigator and embarks on an intentional abuse within the meaning of 2680(h) similarly exceeds the scope of his authority and acts outside his discretion ... contrary to the Constitution or agency guidelines.'' *Id.* Though *Sutton* was decided four years before *Gaubert*, its rationale seems to comport with *Gaubert's* provision that the conduct will not be considered discretionary if it involves mandatory compliance with a ''federal statute, regulation, or policy.'' A reconciliation of *Sutton* with *Gaubert* requires the Court to interpret the language ''mandatory compliance with a federal statute'' to include mandatory compliance with

the Constitution. This broader interpretation suggests that in situations where the Constitution mandates an arresting officer to act a certain way, any conduct deviant of the mandate is non-discretionary.

It is easy to see how the broader interpretation arising from by the reconciliation of *Sutton* and *Gaubert* could become problematic. Plaintiffs could argue that the Constitution, albeit indirectly and abstractly, controls the conduct or decisions of an officer in every circumstance. For example, one could argue that every decision an officer makes while conducting a search or an arrest is non-discretionary if it does not comply with the Fourth Amendment.[14] If successful, these arguments would transform the discretionary function shield from steel to paper. In light of *Gaubert*, however, the statutory or constitutional mandate that eliminates discretion must be specific and intelligible so that the officers knows or should know he loses discretion when the particular circumstances arise which the mandate controls.[15]

Thus, a court must determine whether there is a specific and intelligible constitutional mandate that involves or is related to the alleged intentional torts of the accused officer(s). If such a mandate exists, the Court will conclude, for jurisdictional purposes only, that the alleged torts occurred during the performance of a non-discretionary function.[16] Upon reaching such a conclu-

**14.** While violations of the Fourth Amendment are grounds for inadmissibility of evidence, they should not automatically subject the United States to liability for negligence.

**15.** This requirement is not unlike the *Harlow* criteria for qualified immunity in constitutional tort cases, i.e. that the officer must violate a clearly established constitutional right. *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). Examples of such specific and intelligible constitutional mandates include: the requirement that an officer read *Miranda* warnings and the requirement that an officer refrain from using unnecessary or excessive force while physically restraining a suspect. These are both instances in which the officer knows or should know he cannot exercise his discretion; he has no discretion to deprive the suspect of his *Miranda* warnings nor can he choose to use excessive force. The fact that officers are specifically trained to comply with these constitutional mandates and that law en-

forcement departments and agencies have specific guidelines to ensure their compliance indicates an elimination of discretion. On the other hand, decisions made during the arrest that are based purely on the officer's judgment and experience, decisions not traditionally governed by policy guidelines, federal statutes, or the Constitution, remain protected by the discretionary function exception of the FTCA.

**16.** It is important to emphasize that the discretionary function analysis is a preliminary, jurisdictional analysis which need not reach the merits of whether the officer actually violated the constitutional mandate or committed a constitutional tort. The *Gaubert* test merely instructs the reviewing court to determine whether the alleged conduct ''*involve[s]*'' mandatory compliance with a federal statute, regulation, or policy, not whether the statute, regulation, or policy was violated. Further, the Fifth Circuit Court of Appeals has proclaimed the FTCA does not encom-

sion, the Court may determine the merits of the section 2680(h) intentional tort claims under the applicable state tort law.[17]

■ In this case, the alleged conduct of the officers is controlled by or involves a specific and intelligible constitutional mandate. Thus, the conduct should be considered, for jurisdictional purposes, non-discretionary and the United States may incur liability for the intentional torts arising out of that conduct under section 2680(h), notwithstanding section 2680(a). McElroy and Griesbach claim the S.W.A.T. officers used excessive force when apprehending and detaining them and, in doing so, defied constitutional mandates under the Fourth and Eighth Amendments. Typically, law enforcement agencies and departments have explicit policy guidelines and training programs to prevent officers' use of excessive force when arresting and detaining a suspect. Even if these guidelines or programs do not exist, arresting officers know they must take care not to violate a suspect's civil rights by using excessive force. Therefore, Plaintiffs' allegations that the officers' tackled them, pulled their hair, put guns to their heads, and subjected them to cold temperatures implicate non-discretionary conduct and may expose the United States to liability under section 2680(h) of the FTCA.

■ When determining whether the conduct of law enforcement officers constituted assault, false imprisonment, or false arrest under the FTCA, the United States may invoke any defenses available to individual law enforcement officers under Texas law.[18] See 28 U.S.C. § 2674 (1994). Texas courts have proclaimed that a police officer is entitled to qualified immunity from intentional tort liability "if he is acting in good faith within the course and scope of his authority, and performing discretionary functions." [19] *Vasquez v. Hernandez,* 844 S.W.2d 802, 803 (Tex.App.—San Antonio 1992, *writ dism'd w.o.j.*); *see Bozeman v. Trevino,* 804 S.W.2d 341, 343 (Tex.App.—San Antonio 1991, no

pass federal constitutional torts and it is therefore improper to adjudicate the merits of such torts under the FTCA. *Davis v. United States,* 961 F.2d 53, 57 (5th Cir.1991). The merits of these torts are properly adjudicated in an action under *Bivens* or 42 U.S.C. § 1983. In this respect, the Court disagrees with *Sutton v. United States, supra* because that decision suggests that a court assessing the applicability of the discretionary function exception should consider the merits and decide whether the accused officer actually violated the plaintiff's constitutional rights. In fact, *Sutton* proclaims that a "classic *Bivens*-style tort, in which a federal law enforcement officer uses excessive force ... simply does not involve the exercise of discretion as that term has been applied under § 2680(a)." *Sutton v. United States,* 819 F.2d at 1293. By following this method a court would essentially predetermine FTCA liability by applying federal constitutional law in lieu of state tort law. For example, if the court determines the officer used excessive force and therefore was not performing a discretionary function, it would be impossible to then apply § 2680(h) and conclude he was acting in good faith, within his discretion and is therefore not liable under the state law for assault—good faith and discretion are elements to consider when determining whether a police officer is liable for assault under Texas law. In other words, a conclusion on the merits that the discretionary function exception of § 2680(a) does not apply precludes the analysis based on state tort law required under § 2680(h). Hence, when assessing the viability of the FTCA's discretionary function exception, the courts should merely consider the allegations in the complaint to see whether they concern an area within the officer's discretion. The courts should abstain from deciding the merits of an FTCA claim by applying constitutional law; the merits must be considered exclusively within the framework of the state tort laws. *Brown v. United States,* 653 F.2d 196, 201 (5th Cir. Unit A Aug. 1981), *cert. denied,* 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982).

17. 28 U.S.C. § 1346(b) requires application of the law of the state where the act or omission occurred. *Brown v. United States,* 653 F.2d 196, 201 (5th Cir. Unit A Aug. 1981), *cert. denied,* 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982).

18. There is a dearth of caselaw in this area because, in most cases, police officers are sued individually as *Bivens* defendants, under federal law. In addition, the Texas Tort Claims Act has no equivalent to section 2680(h) of the FTCA. The State does not waive its sovereign immunity for intentional torts of law enforcement officers. *See, e.g., City of San Antonio v. Dunn,* 796 S.W.2d 258, 261 (Tex.App.—San Antonio 1990, writ denied) (declaring the Texas Tort Claims Act specifically exempts intentional torts from the waiver of immunity and provides no exception for the intentional torts of law enforcement officers).

19. Thus, the Court finally reaches the merits of the discretionary function question, i.e. whether the officers, when apprehending Plaintiffs, were acting within their discretion under Texas law.

writ); *Dent v. City of Dallas,* 729 S.W.2d 114, 117 (Tex.App.—Dallas 1986, writ ref'd n.r.e.), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1272, 99 L.Ed.2d 483 (1988). In the few cases where Texas law enforcement officers have been sued for assault, false imprisonment, and false arrest, the officers have raised this affirmative defense of qualified immunity based on good faith. The officers and agents of the OCDETF have raised similar good faith defenses in this case and the Court will now consider them.

First, McElroy and Griesbach allege members of the S.W.A.T. team committed intentional torts when they broke into their apartment, threw them to the floor, placed guns to their heads, and handcuffed them. Under Texas law, if an officer has probable cause—which has been established in this case—he is justified in using such force "the actor reasonably believes * * * is immediately necessary to make * * * an arrest * * * or to prevent * * * escape after the arrest." Texas Penal Code Ann. § 9.51(a) (Vernon 1994). Upon entering McElroy and Griesbach's unit and believing them to be suspects in an international drug operation, the officers reasonably believed it was immediately necessary to apprehend them in the above-described manner.

It is important to recognize that the exigency of the circumstances forced the officers to act purely on instinct; they did not have the luxury of quiet contemplation afforded by the chambers of this courthouse. The instant they crashed through the door, they came face to face with McElroy and saw Griesbach standing near the stairs approximately twenty feet away. They had little time to stop, collect their thoughts, and assess whether McElroy or Griesbach posed a threat to their safety. The only significant physical harm suffered by the Plaintiffs was McElroy's loss of hair and cut on Griesbach's left shin. While the officers undoubtedly intended to tackle McElroy and Griesbach, they did not intend to inflict these injuries upon them. After determining McElroy and Griesbach posed no threat to their safety, the officers did nothing further to physically harm them. Additionally, the officers were justified in pointing a gun at McElroy and Griesbach until they could place them in handcuffs. *See Hinojosa v. City of Terrell,* 834 F.2d 1223, 1231 (5th Cir.1988), *cert. denied,* 493 U.S. 822, 110 S.Ct. 80, 107 L.Ed.2d 46 (1989) (finding that no Texas law "circumscribes a police officer's ability, in the course of duty, to make a conditional threat to use force if necessary by pointing a gun at someone.").

While the officers' method of apprehending McElroy and Griesbach may appear brutal, nothing in the evidence indicates they acted in bad faith or beyond the discretion delegated to police officers under these circumstances. Thus, under Texas law, the officers are protected by qualified immunity and the plaintiff's assault claims under the FTCA must fail.

 McElroy and Griesbach additionally claim the officers committed false arrest and false imprisonment by placing them in handcuffs, taking them next door to Rodriguez's living room, and requiring them to answer questions. In Texas, civil liability for both false arrest and false imprisonment will attach when: 1) there is a willful detention of the person; 2) against the consent of the party detained; and 3) the detention is without the authority of law. *Sears, Roebuck & Co. v. Castillo,* 693 S.W.2d 374, 375 (Tex. 1985); *Sanchez v. Garza,* 581 S.W.2d 258, 259 (Tex.App.—Corpus Christi 1979, no writ); *Pete v. Metcalfe,* 8 F.3d 214, 218–219 (5th Cir.1993). No action will lie against an officer for false arrest or false imprisonment where the detention was executed by virtue of legally sufficient process duly issued by a court of competent jurisdiction. *Pete v. Metcalfe,* 8 F.3d at 218–219; *Sanchez v. Garza,* 581 S.W.2d at 259. Again, the officers detained Plaintiffs during the execution of a valid search warrant issued by the United States Magistrate Judge. Probable cause existed to detain McElroy and Griesbach until the officers could verify they had no involvement in the drug trafficking activity of Rodriguez and posed no threat to the officers' safety. Permitting McElroy and Griesbach to return to their side of the duplex before confirming their innocence would have risked the escape of all the suspects and jeopardized the officers' safety. Once the

officers obtained enough information to certify the innocence of McElroy and Griesbach, they released them. Consequently, Plaintiffs' claims of false arrest and false imprisonment under the FTCA must also fail.[20]

In accordance with the above findings of fact and conclusions of law, the Court will enter judgment for the United States.

### FINAL JUDGMENT

BE IT REMEMBERED on this the 25th day of August, 1993, the Court entered Findings of Fact and Conclusions of Law in the above-styled and numbered cause. In accordance with the Findings of Fact and Conclusions of Law the Court enters the following Final Judgment:

IT IS ORDERED, ADJUDGED AND DECREED that the Plaintiffs, Steve McElroy and Fred Griesbach, take nothing in this cause against the United States of America and that all costs be taxed to the Plaintiff for which let execution issue.

---

**20.** Plaintiffs have not asserted a state tort cause of action for the alleged injuries resulting from their exposure to cold temperatures. They appear to claim this exposure amounted to cruel and unusual punishment in violation of the Eighth Amendment. Again, the FTCA does not encompass constitutional tort claims. *See* Note 11, *supra*.