Emerson v. Borland 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-95-00023-CV







Ernest A. Emerson, Quay Wood, Brian McRae,


Glenn Zoch, and Louis diDonato, Appellants



v.



H. Scott Borland, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT


NO. 435,470, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING







 Appellee H. Scott Borland sued appellants Ernest A. Emerson, Quay Wood, Brian
McRae, Glenn Zoch, and Louis diDonato for damages arising out of his arrest and imprisonment
for five days following appellants' determination that the portable fire extinguishers he was selling
were illegal for sale in Texas. At trial, Borland prevailed on claims pursuant to 42 U.S.C. § 1983
for violation of his Fourth and Fourteenth Amendment rights and on a state common-law tort
claim for false imprisonment. Based on the jury's findings, the trial court rendered judgment that
Borland recover from appellants $100,000 in damages, plus interest and attorney's fees. On
appeal, appellants assert that there is no evidence they violated Borland's Fourth and Fourteenth
Amendment rights or caused him to be falsely imprisoned. Alternatively, appellants contend that,
as a matter of law, they were immune from suit on the basis of qualified and official immunity. 
We will reverse the judgment of the district court.



FACTUAL AND PROCEDURAL BACKGROUND


Circumstances Leading to Borland's Arrest

 Prior to his arrest in 1986, Borland was a traveling sales representative engaged
in the business of selling "Fires Out" brand portable aerosol fire extinguishers in Texas since
1980. The extinguishers are manufactured by Fires Out, Inc. of Hutchinson, Kansas. The label
on the extinguishers indicates that they have been tested and approved by "General Laboratories"
in Hutchinson, Kansas.

 The sale of portable fire extinguishers is regulated by article 5.43-1 of the Insurance
Code. At the time of Borland's arrest, article 5.43-1 provided:



Purpose



Section 1. The purpose of this article is to regulate the leasing, renting, selling,
and servicing of portable fire extinguishers . . . in the interest of safeguarding lives
and property.


. . . .


Definitions



Sec. 3. . . . (c) "Portable fire extinguisher" means any device that contains within
it chemical fluids, powder, or gases for extinguishing fires and has a label of
approval attached by a nationally recognized testing laboratory, such as, but not
limited to, the Underwriters Laboratories Inc. and Factory Mutual Research
Corporation.


. . . .


Selling or leasing of portable fire extinguishers . . .



Sec. 5. (a) No portable fire extinguisher . . . may be leased, sold, rented, or
installed in this state unless it carries a label of approval of a nationally recognized
testing laboratory or a testing laboratory approved by the State Board of
Insurance.


. . . .


Exceptions



Sec. 6. The provisions of this article do not apply to the following:


. . . .


 (d) firms engaged in the retailing or wholesaling of portable fire
extinguishers as defined in Section 3, but not engaged in the installation or
recharging of them;


. . . .


Certain acts prohibited


 

Sec. 10. No person may do any of the following:


. . . .


 (9) sell, rent, or lease a portable fire extinguisher that has not been
approved as provided by Subsection (a) of Section 5 of this article.


. . . .


Penalties



Sec. 12. . . . (b) A person commits an offense if the person knowingly or
intentionally violates Section 10 of this article.


 (c) An offense under Subsection (b) of this section is a Class B
misdemeanor. Venue for the offense is in Travis County.



See Act of May 7, 1981, 67th Leg., R.S., ch. 175, § 1, 1981 Tex. Gen. Laws 416, 416-21,
amended by Act of May 27, 1983, 68th Leg., R.S., ch. 245, §§ 1, 2, 3, 1983 Tex. Gen. Laws
1091, 1091-93 (Tex. Ins. Code Ann. art. 5.43-1, since amended) (emphasis added).

 The state fire marshal's office is charged with enforcing article 5.43-1. Act of May
28, 1975, 64th Leg., R.S., ch. 326, § 2, 1975 Tex. Gen. Laws 853, 857 (Tex. Ins. Code Ann.
art. 1.09A, since repealed and codified at Tex. Gov't Code Ann. § 417.004(a) (West 1990)). At
the time of the events in question, Emerson was the State Fire Marshal, Zoch was director of
licensing for the fire marshal's office, Wood was supervisor of enforcement, diDonato was
general counsel, and McRae was an investigator.

 During 1980 or 1981, the state fire marshal's office determined that the Fires Out
portable fire extinguisher did not comply with article 5.43-1 and therefore could not be sold
legally in Texas. To be legal for sale under the statute, a portable fire extinguisher had to carry
a label of approval from either a "nationally recognized testing laboratory" or a laboratory
approved by the State Board of Insurance. General Laboratories, the laboratory that approved the
Fires Out extinguisher, had not been approved by the State Board of Insurance, (1) and the staff of
the fire marshal's office concluded, based on their collective experience in the fire suppression
industry, that General Laboratories was not a nationally recognized testing laboratory. (2)
 The only
laboratories that the fire marshal's office considered nationally recognized were the two
laboratories listed in the statute: Underwriters Laboratories Inc. ("UL") and Factory Mutual
Research Corporation ("FM").

 In 1981 and 1982, the state fire marshal's office sent Fires Out, Inc. and Borland
letters informing them that the sale of the Fires Out portable fire extinguisher was not legal in
Texas and should be discontinued. The letters stated that only portable fire extinguishers with a
label from either UL or FM were legal for sale in Texas. Both letters invited the recipients to
contact the fire marshal's office if there were any questions. Borland ignored the letters, believing
that Fires Out came within the statute because the statute did not require a label only from UL or
FM, and also believing that General Laboratories was nationally recognized. Borland never
responded to the letters and continued to sell the Fires Out extinguishers. In 1983, the state fire
marshal's office sent Borland a certified letter advising him that the sale of Fires Out extinguishers
was illegal, citing article 5.43-1, and requesting that he contact the office. That letter was
returned unclaimed.

 In June 1985, McRae received a complaint from Beaumont about Fires Out portable
fire extinguishers. McRae had never heard of General Laboratories or Halon 113, the
extinguishing agent listed on Fires Out extinguishers. As a result, McRae contacted Elvin Lane
at Fires Out, Inc. to inquire about the tests General Laboratories had used in approving the
extinguisher and to find out the extinguisher's chemical composition. Lane stated that General
Laboratories had tested the extinguishers to UL standards 608A and B. Lane recommended,
however, that McRae contact General Laboratories directly. McRae later learned that UL
standards 608A and B do not exist, and that standard 608 is a testing standard for burglary vault
doors.

 Taking Lane's advice, McRae contacted Dr. Ronald Wells, head of General
Laboratories. Wells told McRae that the Fires Out portable fire extinguisher had not passed a UL
test. Instead, Wells tested the Fires Out extinguisher with a test he had written because he did not
believe the Fires Out extinguisher would pass a UL test. McRae then contacted Gabriel Hackman
at Dupont, the manufacturer of Halon 113. Hackman told McRae that Dupont referred to the
chemical as Freon 11 (triclorofluromethane) and recommended its use as a commercial refrigerant,
not a fire extinguishing component.

 In early 1986, Emerson and diDonato made a recommendation to the State Board
of Insurance that article 5.43-1 be amended to delete the reference to "nationally recognized
testing laboratory." They proposed this change because they believed the standard was difficult
for laboratories and the fire marshal's office to prove.

 At approximately the same time that Emerson and diDonato were suggesting
changes to the statute, Emerson, Wood, and Zoch, with assistance from diDonato, composed and
distributed a newsletter to local fire officials throughout Texas. The newsletter identified Fires
Out portable fire extinguishers, among others, as illegal for sale in the state. The purpose of the
newsletter was to collect information about where portable fire extinguishers that were considered
illegal under article 5.43-1 were being sold in the state. The newsletter mentioned several brands
of extinguishers, including Fires Out. The newsletter did not, however, mention Borland and did
not indicate that any action should be taken against individuals selling the listed extinguishers, but
only asked local officials to contact Wood at the state fire marshal's office if they found any such
products in their community.

 Several local fire and law enforcement officials responded to the newsletter. 
Callers requesting information about the extinguishers identified in the newsletter were told that
the state fire marshal's office had determined that they were illegal for sale and were referred to
article 5.43-1 of the Insurance Code. Most calls concerning Borland and/or the sale of Fires Out
extinguishers were referred to McRae.

 Shortly after the newsletter was distributed, Wood received a phone call from
Groveton, in Trinity County, asking what statute Borland was violating and if the state fire
marshal had any reason to want Borland detained or arrested. Wood responded in the negative,
directed the caller to the appropriate sections of the Insurance Code, and advised the caller to
contact the Travis County District Attorney. Later someone from Groveton called and informed
Wood that Borland had been arrested there for violations of article 5.43-1.

 At the time the newsletter was distributed, the staff of the state fire marshal's office
had made no attempt to have Borland arrested because they had no personal knowledge that he
was selling Fires Out extinguishers in Texas. Until that point, their knowledge of Borland, his
activities, and the sale of Fires Out portable fire extinguishers was based on reports from local
fire officials. Additionally, the Fires Out case was only one of more than 400 cases the fire
marshal's office was handling and did not have a high priority.

 Thomas Wine, Chief of Police for Columbus, Texas, received a copy of the
newsletter from local fire marshal Lee Hammons and city fire chief Bobby Waller when they
reported that Borland had been selling Fires Out extinguishers in the Columbus area. Wine
contacted the state fire marshal's office to find out what to do about Borland. He was referred
to McRae. McRae told Wine that Fires Out portable fire extinguishers were illegal for sale in
Texas pursuant to article 5.43-1. Wine testified that McRae initially advised him to get a warrant
for Borland's arrest and a few days later told him the warrant could be served when Borland
would be in Groveton, Texas, on or about January 31st to retrieve a briefcase he had left at the
bank. McRae, however, testified that he told Wine where Borland was going to be but never told
Wine to get a warrant for Borland's arrest.

 After his conversations with McRae, Wine swore out a complaint against Borland
for violating section 10 of article 5.43-1. The complaint was presented to a justice of the peace
of Colorado County, and warrant #1680 was issued from Columbus for Borland's arrest on
January 31, 1986. Wine stated that he then contacted the Groveton police chief to inform him
about the Columbus warrant. That afternoon Groveton officials arrested Borland and notified
Wine that they had Borland in custody. Wine requested that a "hold" be placed on Borland for
the Columbus warrant and sent a teletype confirmation of the hold. (3) Wine testified that McRae
later called back and requested that Wine cancel the warrant because a warrant would be issued
from Travis County. Wine withdrew the complaint and the Columbus warrant was never served.

 Meanwhile, also on January 31, 1986, an arrest warrant for Borland was issued out
of Eagle Lake, Texas, for violations of article 5.43-1. After Borland's arrest, Eagle Lake Police
Chief Ben Johnson requested that a hold be placed on Borland; however, the Eagle Lake warrant
was also withdrawn before it was served. There is no evidence in the record to indicate who
brought the complaint in Eagle Lake or whether there was any contact between anyone at the state
fire marshal's office and the Eagle Lake Police Department. Wine testified that he was the person
who requested that the Eagle Lake warrant be cancelled.

 Sergeant Frank Braggs of the Trinity County Sheriff's Department testified that he
was not aware of either warrant before encountering Borland in Groveton. Braggs learned about
Borland after several Groveton citizens and businesses, who became suspicious about whether
Borland was legitimate because he was selling fire extinguishers door to door, contacted the
Groveton Police Department. The Groveton Police Department in turn contacted the Trinity
County Sheriff's Department to investigate the complaints.

 Sergeant Braggs and Officer McClelland of the Groveton Police Department located
Borland at the Groveton bank. While McClelland spoke to Borland, Braggs ran a computer
search and discovered that there were warrants for Borland's arrest out of Eagle Lake and
Columbus for violations of article 5.43-1. Braggs arrested Borland on the basis of these
outstanding warrants. Braggs stated that he never had any contact with anyone from the state fire
marshal's office.

 Also on January 31, 1986, a Groveton policeman and a Groveton fire official
approached Trinity County Attorney Joe Warner Bell and said they had a complaint against
Borland for selling illegal fire extinguishers. Bell told the officers that he needed someone with
personal knowledge of Borland's actions to swear out a complaint before he could take any action. 
Groveton resident Benny McClain, owner of a local hardware store, called Bell shortly thereafter
and stated that he would be willing to swear out a complaint against Borland. Bell did not know
how McClain knew that the Fire's Out portable fire extinguisher violated article 5.43-1. Based
on McClain's complaint, Bell presented an information to Trinity County Judge Jimmy Thornton
charging Borland with a class B misdemeanor under article 5.43-1. At the time the information
was presented, Bell was not aware of the outstanding warrants from Eagle Lake and Columbus.

 Bell testified that, by custom in Trinity County, instead of a warrant being issued
immediately for Borland's arrest, the information normally would have resulted in a summons
being issued to Borland to voluntarily appear before the judge to discuss the charges. If Borland
failed to respond, then a warrant would have been issued for his arrest. Because Borland was
already in custody, however, no summons or warrant was necessary.



The Arrest

 On January 31, 1986, Borland was arrested in Groveton by Sergeant Braggs and
Officer McClelland on the basis of the outstanding warrants out of Eagle Lake and Columbus for
selling portable fire extinguishers in violation of article 5.43-1 of the Insurance Code. After his
arrest, Borland was brought before the justice of the peace and read his rights with regard to both
charges. Borland was later taken before the county judge and charged in Trinity County with
another violation of article 5.43-1. After receiving these warnings, Borland was held in the
custody of the Groveton Police Department for five days. He was released and all charges against
him were dropped on February 4, 1986 after he agreed to pay restitution to individuals who had
purchased a Fires Out extinguisher from him.



The Lawsuit After the Arrest

 After his release, Borland filed suit against appellants (4) alleging that their actions
caused him to be arrested without probable cause, thereby violating his Fourth Amendment right
to be free from unreasonable seizures (5) and depriving him of his Fourteenth Amendment right to
due process. Borland contended that, by distributing the newsletter, Emerson, Wood, Zoch, and
diDonato caused his arrest by spreading misinformation to local fire officials that the sale of Fires
Out extinguishers was illegal for sale in Texas. Additionally, Borland contended that McRae not
only spread misinformation that Borland violated the statute, but also ordered his actual arrest. 
Borland's claims rested on his assertions that either (1) his actions were legal under article 5.43-1
and the state fire marshal's office misinterpreted the statute or (2) the state fire marshal's office
knew that article 5.43-1 was vague in failing to give sufficient notice of what constituted a
"nationally recognized testing laboratory" and therefore acted in bad faith in continuing to enforce
the statute when they had no probable cause to believe the sale of Fires Out extinguishers violated
article 5.43-1. (6)

 In addition to his federal claim, Borland alleged a state-law claim for false
imprisonment. Borland contended that the arrest was unlawful because (1) the warrants were
issued without probable cause, and (2) article 5.43-1 places venue for prosecution in Travis
County and both warrants leading to Borland's arrest were issued out of Colorado County. 
Borland did not sue the police officers who sought the arrest warrants, the police officers who
arrested him, the cities in which he was arrested, or the judges who signed the warrants.

 Appellants denied the allegations and asserted affirmative defenses of qualified and
official immunity. The trial court denied appellants' motion for summary judgment, based in part
on qualified and official immunity, and the case proceeded to trial before a jury. (7) The parties
stipulated that appellants were acting under color of state law and in the course and scope of their
employment.

 At the close of all the evidence, appellants requested a directed verdict on the basis
that (1) Borland had failed to prove that any defendant violated Borland's Fourth and Fourteenth
Amendment rights and failed to prove that any defendant had falsely imprisoned him; (2)
defendants were entitled to qualified immunity because Borland failed to prove by a preponderance
of the evidence that no objectively reasonable officer would have concluded that a warrant should
have been issued for Borland's arrest; and (3) defendants were entitled to official immunity
because Borland failed to prove that any defendant acted in bad faith. The trial court denied the
motion for directed verdict and submitted the charge to the jury. 

 In its charge, the court submitted four questions to the jury: (8)



QUESTION NO. 1:


 Did any of the Defendants proximately cause the deprivation of Scott
Borland's Constitutional rights under the Fourth Amendment to the U.S.
Constitution?


[The jury answered "yes" for each defendant.]



QUESTION NO. 2:


 Do you find from a preponderance of the evidence that any of the individual
Defendants is entitled to the defense of official, or quasi-judicial, immunity?


 Ernest Emerson Yes

 Quay Wood Yes

 Brian McRae No

 Glenn Zoch Yes

 Lewis diDonato Yes


QUESTION NO. 3:


 Did any of the Defendants proximately cause the false imprisonment of
Scott Borland?


[The jury answered "yes" for each defendant.]



In answer to question four, the jury found $100,000 in past damages and no future damages.

 Appellants filed motions to disregard the verdict and for judgment notwithstanding
the verdict. The court denied the motions and rendered judgment for Borland on the jury's
verdict, awarding Borland $100,000 in actual damages, $43,570.50 in attorneys' fees, and
$87,297.63 in prejudgment interest. Based on the jury's answers to questions one and three, the
court held all defendants jointly and severally liable on the judgment. The trial court concluded
that no defendant was entitled to the defense of qualified immunity. Appellants' motions to
modify the judgment and for new trial were overruled by operation of law. This appeal ensued.


DISCUSSION


 In points of error one and two, appellants assert that there is no evidence they
caused a deprivation of Borland's Fourth and Fourteenth Amendment rights or caused Borland
to be falsely imprisoned. In points of error three and four, appellants assert that, as a matter of
law, they were entitled to qualified and official immunity.

 In deciding a no-evidence point, we must consider only the evidence and inferences
tending to support the finding of the trier of fact and disregard all evidence and inferences to the
contrary. Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995); Best v. Ryan
Auto Group, Inc., 786 S.W.2d 670, 671 (Tex. 1990). We will uphold the finding if more than
a scintilla of evidence supports it. Crye, 907 S.W.2d at 499; Seideneck v. Cal Bayreuther
Assocs., 451 S.W.2d 752, 755 (Tex. 1970); In re King's Estate, 244 S.W.2d 660, 661 (Tex.
1951). The evidence supporting a finding amounts to more than a scintilla if reasonable minds
could differ in their conclusions. Crye, 907 S.W.2d at 499; Transportation Ins. Co. v. Moriel,
879 S.W.2d 10, 25 (Tex. 1994). See generally William Powers, Jr. & Jack Ratliff, Another Look
at No Evidence" and "Insufficient Evidence," 69 Tex. L. Rev. 515 (1991); Michol O'Connor,
Appealing Jury Findings, 12 Hous. L. Rev. 65 (1974). Evidence equally susceptible of two
opposite inferences, however, is no more than a scintilla of evidence and cannot support a
judgment. Tubelite v. Risica & Sons, Inc., 819 S.W.2d 801, 805 (Tex. 1991); Litton Indus.
Products, Inc. v. Gammage, 668 S.W.2d 319, 324 (Tex. 1984).

 In deciding a legal-sufficiency point of error that attempts to overcome an adverse
fact finding as a matter of law, we must first consider only the evidence and inferences tending
to support the finding, disregarding all evidence and inferences to the contrary; if there is no
evidence to support the finding, we must then examine the entire record to see if the contrary
proposition is established as a matter of law. Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690
(Tex. 1989); Holley v. Watts, 629 S.W.2d 694, 696 (Tex. 1982); see also Texas & N.O.R.R. v.
Burden, 203 S.W.2d 522, 528-31 (Tex. 1947). See generally Powers & Ratliff, supra, 69 Tex.
L. Rev. at 523. 



Borland's Federal Claim

 (i) Deprivation of Constitutional Rights. Borland's federal claim of violation of his
Fourth and Fourteenth Amendment rights was brought pursuant to 42 U.S.C. § 1983. Section
1983 provides a remedy when any person acting under color of state law deprives another of
rights protected by the Constitution. (9) In analyzing the propriety of a section 1983 claim, the court
must first determine whether the plaintiff has been deprived of a right secured by the Constitution. 
Baker v. McCollan, 443 U.S. 137, 140 (1979); see Pyles v. Raisor, 60 F.3d 1211, 1213 (6th Cir.
1995) (holding that arrestee could not recover under section 1983 for arrest that violated Kentucky
law but comported with minimum requirements of Fourth Amendment). The plaintiff bears the
burden of proving a constitutional violation by a preponderance of the evidence. See Crowder v.
Sinyard, 884 F.2d 804, 824 (5th Cir. 1989).

 If the court finds that the plaintiff has suffered a violation of his constitutional
rights, the second inquiry is whether the defendants are responsible for that violation. Collins v.
City of Harker Heights, 503 U.S. 115, 120 (1992). Only after the court has found that the
defendants have caused a violation of the plaintiff's constitutional rights should the court consider
whether the defendants are entitled to the defense of qualified immunity. See Seigert v. Gilley,
500 U.S. 226, 232 (1991).

 The Fourth Amendment requires that no arrest warrant should issue absent a
showing of probable cause. U.S. Const. amend. IV. Probable cause is a fluid concept that turns
on the assessment of probabilities in particular factual contexts resistant to being reduced to a set
of legal rules. Illinois v. Gates, 462 U.S. 213, 232 (1983). The determination is derived from
assessing the totality of the circumstances to assess whether the facts alleged in the affidavit
underlying the warrant show a fair probability that an individual has committed an offense. See
id. at 238. In assessing whether probable cause existed to justify the issuance of an arrest
warrant, a reviewing court is limited to an examination of the four corners of the supporting
complaint or affidavit. Gibbs v. State, 819 S.W.2d 821, 830 (Tex. Crim. App. 1991).

 In the present case, Borland's arrest was based on arrest warrants from Columbus
and Eagle Lake. Borland does not challenge the facial validity of the warrants. Nor does he
complain that the complaints (i.e., affidavits) on which the warrants were based contained false
statements. He contends instead that the complaints, and hence the warrants, were invalid because
they were based on a misinterpretation of article 5.43-1 by appellants. See Franks v. Delaware,
438 U.S. 154, 155-56, 171 (1978). (10)

 A mere misinterpretation of a statute, however, is not enough to form the basis of
a section 1983 action. To be actionable under section 1983, the act of a state official must
constitute an "affirmative abuse of power"; mere negligence or lack of due care does not work a
deprivation "in the constitutional sense" and hence will not support a section 1983 action. Daniels
v. Williams, 474 U.S. 327, 330-31 (1986).

 In an attempt to satisfy this requirement, Borland argues that appellants'
interpretation of article 5.43-1 was not merely wrong, it was so grossly wrong as to constitute
evidence of bad faith or reckless conduct. This contention is based on two related arguments: 
(1) appellants did not understand the law they accused Borland of violating, because they did not
know what "nationally recognized testing laboratory" meant; and (2) appellants had no criteria for
determining what a nationally recognized testing laboratory was.

 First, we believe that an enforcement officer's lack of complete understanding of
a criminal statute is no evidence that an attempt to enforce the statute was reckless or in bad faith. 
With all due respect to the legislature, it is not uncommon for statutes, including criminal statutes,
to contain phrases and terms that are less than crystal clear. Yet the officers who are charged with
the enforcement thereof are not relieved from their duty by such imperfections. Until further
guidance is given by the legislature or the courts, such officials must fashion a reasonable
interpretation and carry on as best they can.

 Second, we conclude that under the circumstances of the present case, appellants'
lack of formal criteria for identifying a "nationally recognized testing laboratory" does not give
rise to an inference of bad faith or reckless conduct. Although the term "nationally recognized
testing laboratory" was not defined in the statute, the legislature gave two examples of laboratories
that did meet that standard. The evidence is undisputed that appellants used those examples to
construct their own informal criteria: laboratories equivalent to or on the same order of national
recognition as UL and FM. Moreover, in our opinion the fact that appellants did not initiate a
formal investigation into General Laboratories before deciding that it did not meet the test of
"nationally recognized testing laboratory" is no evidence of bad faith or recklessness. Appellants
are experts in the fire suppression field with many years experience, yet none of them had ever
heard of General Laboratories. Although they might differ in minor respects about what
constituted a nationally recognized testing laboratory, they agreed on one thing: General
Laboratories was not one.

 We conclude that the evidence in this record would support, at most, a finding that
appellants were negligent in the manner in which they decided that General Laboratories was not
a nationally recognized testing laboratory and, hence, that Borland was violating state law in
selling Fires Out portable fire extinguishers. As discussed above, however, negligence is not
sufficient to support a section 1983 action. Daniels, 474 U.S. at 330-31. Point of error one is
sustained.

 (ii) Qualified immunity. Even if Borland had established that his constitutional
rights were violated and that appellants were responsible for those violations, we would still
conclude that appellants are entitled to qualified immunity. Under federal law, "government
officials performing discretionary functions generally are shielded from liability for civil damages
if their conduct does not violate clearly established statutory or constitutional rights of which a
reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)
(emphasis added). To preclude immunity from suit, the clearly established right must be the
federal right on which the claim for relief is based and must be established at the time of the
violation. Elder v. Holloway, 127 L. Ed. 2d 344, 350, 351 (1994). The test of what is a "clearly
established law" must bear a relationship to the "objective legal reasonableness" that is the
touchstone of Harlow. Anderson v. Creighton, 483 U.S. 635, 639 (1987).

 If the contours of the right are not so clear that a reasonable official would
understand that what he is doing violates that right, then qualified immunity will be found. 
Anderson, 483 U.S. at 640. While the alleged wrong need not have been previously held
unlawful, to subject an official to liability the unlawfulness must be apparent in light of pre-existing law. Id.; Brawner v. City of Richardson, 855 F.2d 187, 192 (5th Cir. 1988). As a
result, qualified immunity is a powerful shield that will protect "all but the plainly incompetent
or those who knowingly violate the law." Swint v. City of Wadley, 5 F.3d 1435, 1442 (11th Cir.
1993), cert. denied, 115 S. Ct. 1312 (1995) (emphasis added).

 The Fourth Amendment's guarantee that warrants should not issue without probable
cause is a clearly established right. Habinger v. City of Fargo, 1996 WL 154408 *5 (8th Cir.
1996). Our analysis must focus, however, on whether a reasonable official in appellants'
circumstances would have known that appellants' actions violated that clearly established right. 
The record reflects that Emerson, Wood, Zoch, and diDonato's only involvement in the chain of
events leading to Borland's arrest was their communication to local law enforcement officials in
a newsletter that Fires Out did not carry a label of approval from a "nationally recognized testing
laboratory" under article 5.43-1 and therefore was considered illegal for sale in Texas. In
addition to conveying this conclusion to local law enforcement officials, there is some evidence
that, based on the interpretation of the statute made by his superiors, McRae instructed Wine to
arrest Borland. While there is no evidence linking any action of appellants with the arrest warrant
issued out of Eagle Lake, we will once again, for purposes of this discussion, assume that
appellants' newsletter was the impetus for the issuance of that warrant.

 The interpretation of a statute by an official charged with its enforcement is a
discretionary function:



Police are charged to enforce laws until and unless they are declared
unconstitutional. The enactment of a law forecloses speculation by enforcement
officers concerning its constitutionalitywith the possible exception of a law so
grossly and flagrantly unconstitutional that any person of reasonable prudence
would be bound to see its flaws. Society would be ill-served if its police officers
took it upon themselves to determine which laws are and which are not
constitutionally entitled to enforcement.



Michigan v. DeFillippo, 443 U.S. 31, 38 (1979).

 Article 5.43-1 has not been declared unconstitutional and that issue is not currently
before us. As noted above, however, although the statute does not define "nationally recognized
testing laboratory," it provides two examples for what is considered nationally recognized. Thus,
the statute provides guidelines for interpretation that prevent us from concluding that it is
unconstitutionally vague. We conclude that article 5.43-1 is not so facially infirm, nor appellants'
interpretation so obviously wrong, that a reasonable official in appellants' circumstances would
believe that an attempt to enforce it was without lawful authority.

 With regard to their interpretation of the statute, appellants' uncontradicted
testimony reflects that based on their experience in the fire suppression industry, they believed
that General Laboratories was not the same quality laboratory as UL and FM and was not
nationally recognized. As discussed above, even if appellants' interpretation of the statute was
wrong, a good faith misinterpretation of a statute is at best negligence, and negligence is not
actionable under section 1983. See Daniels, 474 U.S. at 330. There is no evidence that
appellants knew that the interpretation that they communicated was wrong or that they
communicated it recklessly without regard to its correctness. We believe that under these facts,
no reasonable official would believe that the mere communication to independent law enforcement
officials of a good faith interpretation of a statute or the instruction to arrest an individual who
is violating the statute based on that interpretation could be a violation of Fourth or Fourteenth
Amendment rights. Appellants were, therefore, entitled to be protected from liability by the
qualified-immunity defense. We sustain point of error three.



Borland's State-Law Claim

 (i) False imprisonment. Borland's state-law claim alleged that appellants caused
him to be falsely imprisoned. The elements of a false imprisonment claim are (1) a willful
detention, (2) without consent, and (3) without authority of law. Sears, Roebuck & Co. v.
Castillo, 693 S.W.2d 374, 375 (Tex. 1985); James v. Brown, 637 S.W.2d 914, 918 (Tex. 1982);
see also McElroy v. United States, 861 F. Supp. 585, 595 (W.D. Tex. 1994). Appellants argue
that Borland's claim for false imprisonment fails because he was arrested pursuant to a lawful
arrest. Having already concluded that Borland's arrest caused no federal constitutional violation,
we must now determine whether the arrest was unlawful under state law. See Ker v. California,
374 U.S. 23, 37 (1963); Amores v. State, 816 S.W.2d 407, 413 (Tex. Crim. App. 1991) (holding
that legality of state arrest is determined by state law, so long as that law is not violative of
Federal Constitution).

 It is settled law in Texas that "[i]f an arrest or detention is executed under process
which is legally sufficient in form and duly issued by a court of competent jurisdiction, an action
for false imprisonment will not lie." James, 637 S.W.2d at 918. In the present case, the arrest
was based on perceived violations of Insurance Code article 5.43-1 and executed pursuant to
warrants issued out of Columbus and Eagle Lake. Borland contends that his arrest was unlawful
for two reasons: (1) no probable cause existed to issue the warrants; and (2) the warrants were
not issued from Travis County, where article 5.43-1 places venue, and therefore were not issued
by courts of competent jurisdiction.

 We reject the first argument because Borland's challenge is not to the legal
sufficiency of the form of the process by which the arrest warrants were issued. Moreover, it
appears that the rule of James v. Brown prohibits a court from looking behind the form of the
process by which an arrest is made. If the form of the process is legally sufficient, that aspect of
the inquiry ends. Finally, as discussed above, there is no evidence that appellants acted in bad
faith or recklessly in disseminating their interpretation of article 5.43-1.

 We also reject Borland's contention that, because article 5.43-1 places venue in
Travis County, only a court in Travis County has authority to issue an arrest warrant for a
violation of that statute. We believe Borland fails to make a proper distinction between
jurisdiction and venue. Jurisdiction is the power of a court to hear and determine a cause. Ex
Parte Watson, 601 S.W.2d 350, 351 (Tex. Crim. App. 1980). Venue, on the other hand, merely
refers to the place where a case may be tried. Boyles v. State, 820 S.W.2d 122, 139-40 (Tex.
Crim. App. 1989), cert. denied, 503 U.S. 921 (1992); Etchieson v. State, 574 S.W.2d 753 (Tex.
Crim. App. 1978), cert. denied, 440 U.S. 936 (1979).

 Courts have jurisdiction to issue warrants with statewide authority regardless of
where venue lies. Article 15.03 of the Code of Criminal Procedure provides:



(a) A magistrate may issue a warrant of arrest or a summons:


 1. In any case in which he is by law authorized to order verbally the arrest
of an offender;


 2. When any person shall make oath before the magistrate that another has
committed some offense against the laws of the State; and


 3. In any case named in this Code where he is specially authorized to issue
warrants of arrest.



Tex. Code Crim. Proc. Ann. art. 15.03 (West 1977). The designation of venue in article 5.43-1
restricts where Borland could be tried for the charged offense. The venue provision does not,
however, restrict a court's power to issue an arrest warrant prior to the commencement of
prosecution. Accordingly, we conclude the Columbus and Eagle Lake arrest warrants were issued
by courts of competent jurisdiction. For purposes of his false imprisonment claim, therefore,
Borland's arrest and detention were, as a matter of law, not unlawful under state law. We sustain
point of error two.

 (ii) Official Immunity. Even if Borland had succeeded in proving that his arrest was
unlawful under state law, we would still conclude that McRae was entitled to the defense of
official immunity. (11) Under Texas law, governmental employees are entitled to official immunity
from suit arising from performance of their discretionary duties in good faith as long as they are
acting within the scope of their authority. City of Lancaster v. Chambers, 883 S.W.2d 650, 653
(Tex. 1994). On appeal, Borland contends that the only issue is whether McRae was acting in
good faith. The test for good faith is one of objective legal reasonableness, without regard to
whether the official acted with subjective good faith. Id. at 656.

 Based on our foregoing discussion of Borland's federal claim, we conclude that as
a matter of law it was objectively reasonable for McRae to have believed that (1) his superiors'
interpretation of article 5.43-1 was correct; and (2) a warrant could have been validly issued from
Colorado County for a violation of article 5.43-1. Accordingly, we hold that the evidence
demonstrates conclusively that McRae is protected by the official immunity defense. We sustain
point of error four.



CONCLUSION


 In light of the foregoing disposition, we need not address appellants' remaining
points of error. We reverse the judgment of the trial court and render judgment that Borland take
nothing.



 J. Woodfin Jones, Justice

Before Chief Justice Carroll, Justices Jones and B. A. Smith

Reversed and Rendered

Filed: July 17, 1996

Publish
1.   At the time of events in question, the State Board of Insurance had given approval
only to Underwriter's Laboratory, Factory Mutual Research Corporation, and the United
States Testing Company. See Tex. Admin. Code § 27.7 (West 1984).
2.   Despite their many years of collective experience in the fire suppression industry,
appellants had neither heard of General Laboratories nor encountered any fire marshal
who had.

3.   Wine stated that a "hold" notifies another law enforcement agency that the notifying
agency has a warrant on a person that the other agency already has in custody. The hold
requests the other agency to contact the notifying agency before the person in custody is
released so that the notifying agency may then come and serve their warrant.
4.   In addition to the appellants herein, Borland originally sued Doyce R. Lee,
individually and as the Commissioner of the State Board of Insurance, Edwin J. Smith,
Jr., individually and as the Chairman of the Board of the State Board of Insurance,
David H. Thornberry, individually and as a Member of the State Board of Insurance, and
James L. Nelson, individually and as a Member of the State Board of Insurance. Borland
eventually nonsuited those defendants.
5.   The Fourth Amendment to the Constitution provides:


The right of the people to be secure in their persons, houses, papers, and
effects, against unreasonable searches and seizures, shall not be violated, and
no Warrants shall issue, but upon probable cause, supported by Oath or
affirmation, and particularly describing the place to be searched, and the
person or things to be seized.


U.S. Const. amend. IV.
6.   Neither the correct interpretation of the statute nor its constitutionality were issues
properly before the district court and accordingly are not present for our review.
7.   After their motion for summary judgment was denied, appellants attempted to
appeal to this Court pursuant to Texas Civil Practice and Remedies Code section
51.014(5). Because the suit was originally brought before the effective date of section
51.014(5), however, the appeal was dismissed for want of jurisdiction. Emerson v.
Borland, 838 S.W.2d 951, 952 (Tex. App.Austin 1992, no writ).
8.   The court's instructions and definitions have been omitted.
9.   Section 1983 states:


Every person who, under color of any statute, ordinance, regulation, custom,
or usage, of any State or Territory, subjects, or causes to be subjected, any
citizen of the United States or other person within the jurisdiction thereof to
the deprivation of any rights, privileges, or immunities secured by the
Constitution and laws shall be liable to the party injured in an action at law,
suit in equity, or other proper proceeding for redress . . . .


42 U.S.C.A. § 1983 (West 1994).
10.   The arresting officer testified without contradiction that Borland was arrested as a
result of both the Columbus and Eagle Lake warrants. Although the Columbus warrant and
complaint are in the record, neither of those documents from Eagle Lake is. Nor is there
evidence of any connection between the Eagle Lake complaint or warrant and any of the
appellants. Since Borland's claims stand or fall on the invalidity of the warrants by which he
was arrested and on a causal link between appellants and his arrest, this deficiency alone
probably renders the evidence legally insufficient to support the elements of his section 1983
and false imprisonment claims. Nonetheless, because we reach the same result on other
grounds, we will assume for the sake of argument that the form, content, and genesis of the
Eagle Lake complaint and warrant were the same as that of the Columbus documents.
11.   As indicated above, the jury found that all defendants except McRae were entitled
to official immunity with respect to Borland's false imprisonment claim. It does not
appear that the trial court disregarded those findings, nor does Borland challenge them
here. Accordingly, we will address the official immunity defense only as it relates to
McRae.



ate Board of Insurance had given approval
only to Underwriter's Laboratory, Factory Mutual Research Corporation, and the United
States Testing Company. See Tex. Admin. Code § 27.7 (West 1984).
2.   Despite their many years of collective experience in the fire suppression industry,
appellants had neither heard of General Laboratories nor encountered any fire marshal
who had.

3.   Wine stated that a "hold" notifies another law enforcement agency that the notifying
agency has a warrant on a person that the other agency already has in custody. The hold
requests the other agency to contact the notifying agency before the person in custody is
released so that the notifying agency may then come and serve their warrant.
4.   In addition to the appellants herein, Borland originally sued Doyce R. Lee,
individually and as the Commissioner of the State Board of Insurance, Edwin J. Smith,
Jr., individually and as the Chairman of the Board of the State Board of Insurance,
David H. Thornberry, individually and as a Member of the State Board of Insurance, and
James L. Nelson, individually and as a Member of the State Board of Insurance. Borland
eventually nonsuited those defendants.
5.   The Fourth Amendment to the Constitution provides:


The right of the people to be secure in their persons, houses, papers, and
effects, against unreasonable searches and seizures, shall not be violated, and
no Warrants shall issue, but upon probable cause, supported by Oath or
affirmation, and particularly describing the place to be searched, and the
person or things to be seized.


U.S. Const. amend. IV.
6.   Neither the correct interpretation of the statute nor its constitutionality were issues
properly before the district court and accordingly are not present for our review.
7.   After their motion for summary judgment was denied, appellants attempted to
appeal to this Court pursuant to Texas Civil Practice and Remedies Code section
51.014(5). Because the suit was originally brought before the effective date of section
51.014(5), however, the appeal was dismissed for want of jurisdiction. Emerson v.
Borland, 838 S.W.2d 951, 952 (Tex. App.Austin 1992, no writ).
8.   The court's instructions and definitions have been omitted.
9.   Section 1983 states:


Every person who, under color of any statute, ordinance, regulation, custom,
or usage, of any State or Territory, subjects, or causes to be subjected, any
citizen of the United States or other person within the jurisdiction thereof to
the deprivation of any rights, privileges, or immunities secured by the
Constitution and laws shall be