REVISED FEBRUARY 27, 2009
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 20, 2009

Charles R. Fulbruge III
Clerk

No. 07-40416

MONICA CASTRO, For Herself and as Next Friend of R.M.G., a Minor Child

Plaintiffs-Appellants

v.

UNITED STATES OF AMERICA

Defendant-Appellee

———————

Appeal from the United States District Court
for the Southern District of Texas

———————

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Plaintiffs-Appellants Monica Castro for herself and as next friend of R.M.G., a minor child (collectively "Castro"), brought suit against the United States of America ("the Government") under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 et seq. Castro alleged, inter alia, that the Government's negligence caused the wrongful deportation of R.M.G., a U.S. citizen. The Government filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) or, alternatively, for summary judgment pursuant to Rule 56. The district court held that the Government is protected from suit due to 28 U.S.C. § 2680(a), the discretionary function exception of the FTCA.

Subsequently, the district court entered a final judgment dismissing Castro's tort claims for lack of subject matter jurisdiction and dismissing her constitutional claims as moot. Castro timely appealed.

FACTUAL AND PROCEDURAL BACKGROUND

The pertinent facts in this case are not in dispute. Castro, a United States citizen, moved with her parents from Corpus Christi, Texas to Lubbock, Texas when she was approximately fifteen years old. Around that time, Castro met Omar Gallardo, an illegal alien and Mexican national. When Castro was sixteen, she and Gallardo moved together into a trailer near the trailer that Castro's parents rented. On December 4, 2002, Castro gave birth to her and Gallardo's daughter, R.M.G. R.M.G., who was born at the University Medical Center in Lubbock, is a citizen of the United States. Castro was seventeen at the time of R.M.G.'s birth.

Castro and Gallardo had a history of arguing with each other, and Castro contends that Gallardo abused her during the course of their relationship, although she informed neither her parents nor law enforcement authorities of this abuse. Castro maintained that Gallardo was a good father to R.M.G., and that he never abused their daughter.

On November 28, 2003, Castro and Gallardo got into an argument, and as a result, Castro called and asked her grandparents to come and pick her up. They came the following day, and Castro left the trailer; R.M.G. remained with Gallardo. Immediately thereafter, Castro commenced efforts to recover R.M.G. from Gallardo. Specifically, she contacted the Lubbock County Sheriff's Department, Texas Child Protective Services ("CPS"), and the Lubbock Police Department. The agencies told her that since she was married to Gallardo pursuant to a common-law marriage,[1] and because Gallardo was the child's

---

[1] There is a dispute about whether Castro and Gallardo had a legally-established common-law marriage at the time of R.M.G.'s birth. Before the district court, Castro argues

2

father, Gallardo had as much right to R.M.G. as she did. Further, Castro was told that her issues with Gallardo constituted a civil dispute, and that she would have to hire a private attorney to seek a custody order. CPS did tell Castro that she could fill out an application to start the process for obtaining assistance from CPS, but that the process would take one to two days. Castro did not fill out the application because she said she did not want to wait one to two days.

On December 1, 2003, Castro, along with her aunt, Sophia Rodriguez, went to the Lubbock Border Patrol station to report that Gallardo was an illegal alien. They spoke with Border Patrol Agent Manuel Sanchez, and they told Sanchez that while Gallardo currently had R.M.G., Castro wanted to recover R.M.G. from him.[2] Agent Sanchez informed Castro that she needed to get a court order for temporary custody of R.M.G. However, Agent Sanchez said that if Castro was present when Border Patrol apprehended Gallardo and certain of his relatives, who were also illegal aliens, Border Patrol would leave R.M.G. with Castro, since they both were U.S. citizens. However, Castro did not wish to be present when Border Patrol went to the trailer because she was afraid of what Gallardo and his family would do to her. Accordingly, on the morning of December 3, 2003, Castro was not present when Border Patrol Agents arrived at the trailer Castro shared with Gallardo; rather, Castro watched the events unfold from her relatives' trailer across the street.

Border Patrol took Gallardo, three of his brothers, and his cousin to the Lubbock Border Patrol station. Since Gallardo had R.M.G. with him, R.M.G.

___

that she could not have agreed to a common-law marriage until her eighteenth birthday, which was April 30, 2003. This issue was not resolved by the district court. However, there is no dispute that Gallardo is R.M.G.'s biological father; accordingly, we need not resolve whether there was a common-law marriage.

[2] Agent Sanchez informed Castro that Amarillo law enforcement authorities wanted to question Gallardo as a possible witness in connection with a homicide.

was also taken to the station. Gallardo, R.M.G., and Gallardo's relatives were all placed in a holding cell at the station.

Shortly thereafter, Castro arrived at the station and requested that her daughter be returned to her. However, Gallardo informed the Border Patrol Agents that Castro had walked out on him and R.M.G. and that he wanted R.M.G. to remain with him. At the direction of Greg Kurupas, who was the agent-in-charge, Agent Sanchez contacted Debbie Perkins-McCall of the Texas Department of Family and Protective Services ("DFPS") in Lubbock. Since there was no evidence that R.M.G. was abused or neglected, Agent Sanchez was informed that DFPS would not get involved.[3] Meanwhile, Border Patrol processed Gallardo and his relatives and prepared to repatriate them back to Mexico. While in custody, Gallardo admitted he was in the United States illegally and chose to reinstate an earlier deportation order. The transport to Mexico from Lubbock left at 3:15 p.m. daily, and Border Patrol made plans to send Gallardo and his relatives at that time.

Around 1:30 in the afternoon, Castro and her relatives retained an attorney, Lisa Trevino, in order to obtain a temporary custody order. Trevino drafted the necessary paperwork and proceeded to the courthouse to get a judge's signature on the order. Trevino told Agent Kurupas that she was working on obtaining a judge's signature on a temporary custody order; however, the agent told her that the repatriation transport had to leave by 3:15 p.m. By the time the transport left, Trevino had been unable to obtain a judge's

---

[3] Perkins-McCall testified before the district court: "In December of 2003, I received a telephone call from a male Border Patrol Agent and he advised me that he had a Mexican citizen father with possession of his child and that the father was to be returned to Mexico. He further advised me that the mother sought possession of the child, but that the father did not want to relinquish possession of the child. The agent asked me if this was a situation in which our department would get involved. I asked the agent if there was any issue of abuse of the child or harm to the child and he advised me there was not. I told him that absent any issue of abuse of the child or harm to the child, the Texas Department of Family and Protective Services would not get involved."

signature. Trevino never filed any documents with the state court regarding the custody of R.M.G., and she did not further pursue a custody order for Castro.

The transport left Lubbock around 3:15 p.m. on December 3, 2003 with Gallardo onboard, along with R.M.G. In September 2006, Gallardo was detained in the Amarillo area on charges of illegal reentry. While he was in custody, Gallardo and Castro came to an agreement whereby R.M.G., who was living in Mexico with Gallardo's parents, would be returned to the custody of Castro. R.M.G. was returned to Castro's custody on December 1, 2006.

Castro filed a lawsuit on February 10, 2006, in the United States District Court for the Southern District of Texas on her own behalf and as next friend of her daughter, R.M.G. In her original complaint, Castro sought monetary damages and injunctive relief pursuant to the Fourth, Fifth, and Tenth Amendments of the United States Constitution, as well as claims of negligence, intentional infliction of emotional distress, and false imprisonment against the United States pursuant to the FTCA. The district court dismissed Castro's constitutional claims for monetary relief, holding that such claims were barred by the doctrine of sovereign immunity. Castro then filed her First Amended Complaint on May 19, 2006. In this complaint, Castro asserted claims for injunctive relief under the Fourth and Fifth Amendments of the United States Constitution as well as claims of negligence, intentional infliction of emotional distress, false imprisonment, abuse of process, and assault pursuant to the FTCA. Castro also asserted a claim for injunctive and declaratory relief pursuant to 8 U.S.C. § 1101, et. seq.

On November 14, 2006, the Government filed a motion to dismiss pursuant to Rule 12(b)(1), and in the alternative, motion for summary judgment pursuant to Rule 56. The Government argued, inter alia, that the district court did not have subject matter jurisdiction over Castro's tort claims because they are barred by the discretionary function exception to the FTCA. On February

9, 2007, the district court granted the Government's motion to dismiss for lack of subject matter jurisdiction; the court also held that Castro's claims for relief under the Fourth and Fifth Amendments and her claim for injunctive relief pursuant to 8 U.S.C. § 1101, et. seq. were moot and therefore dismissed them as well. On April 4, 2007, the district court dismissed Castro's only remaining claim which sought declaratory relief "in the form of determination of the validity of any statute, regulation, policy or other procedure relied on to detain and deport Plaintiff R.M.G." for lack of standing. That same day, the district court entered its final judgment dismissing the action in its entirety with prejudice.

Castro timely filed her notice of appeal. The only issue Castro raises on appeal is whether the district court erred in dismissing her FTCA claims for lack of subject matter jurisdiction.

## STANDARD OF REVIEW

"Whether the district court lacked jurisdiction to consider the government's conduct in this case is a question of law, subject to de novo review by this court." Buchanan v. United States, 915 F.2d 969, 970 (5th Cir. 1990) (citing Baker v. United States, 817 F.2d 560, 562 (9th Cir. 1987)). The party asserting jurisdiction bears the burden of proof for a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss. Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001). A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject-matter jurisdiction. See Lane v. Halliburton, 529 F.3d 548, 557 (5th Cir. 2008) (citing Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)). "[U]nder Rule 12(b)(1), the court may find a plausible set of facts supporting subject matter jurisdiction by considering any of the following: '(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's

resolution of disputed facts.'" Lane, 529 F.3d at 557 (quoting Barrera-Montenegro v. United States, 74 F.3d 657, 659 (5th Cir. 1996) (internal citations omitted)).

DISCUSSION

"As the sovereign, the United States is immune from suit unless, and only to the extent that, it has consented to be sued." Truman v. United States, 26 F.3d 592, 594 (5th Cir. 1994) (citing Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471 (1994)). Through the FTCA, the United States has consented to suits "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ." 28 U.S.C. § 1346(b)(1); see also Truman, 26 F.3d at 594 ("Through the enactment of the FTCA, the government has generally waived its sovereign immunity from tort liability for the negligent or wrongful acts or omissions of its agents who act within the scope of their employment.")

There are a number of statutory exceptions to the FTCA, two of which are relevant to the resolution of this appeal. First, the "intentional tort" exception provides that the FTCA does not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). However, that same provision also waives sovereign immunity for the intentional torts of law enforcement and investigative officers. Id. (explaining that the FTCA shall apply "to acts or omissions of investigative or law enforcement officers of the United States Government . . . [for] any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution.").[4]

---

[4] This court has previously addressed the congressional intent of § 2680(h): "Congress, in response to 'no knock' raids conducted by federal narcotic agents on the wrong dwellings,

The other relevant exception is the "discretionary function" exception, which provides that the United States is not liable for:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a); see also Sutton v. United States, 819 F.2d 1289, 1293 (5th Cir. 1987) ("[T]he government is not liable for any claim arising from the exercise of discretion in the performance of governmental functions or duty whether or not the discretion involved be abused." (citing Dalehite v. United States, 346 U.S. 15, 33 (1953) (internal quotation marks omitted)). "The exception only covers acts that are discretionary in nature, acts that 'involve an element of judgment or choice.'" Gaubert, 499 U.S. at 322 (citing Berkovitz v. United States, 486 U.S. 531, 536 (1988)). In United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813 (1984), the Supreme Court explained that it is the nature of the conduct and not the status of the government actor that governs whether the exception applies.

In Gaubert, the Supreme Court laid out a two-step test for determining whether the discretionary function exception applies to a federal employee's act or omission. First, the challenged government action must be "the product of judgment or choice." Gaubert, 499 U.S. at 322. This Court has explained:

> Under this prong, we determine whether a statute, regulation, or policy mandates a specific course of action. If such a mandate exists, the discretionary function exception does not apply and the claim may move forward. When no mandate exists, however, the

---

passed the 1974 amendment to the Federal Tort Claim Act to provide compensation [for the victims]." Solomon v. United States, 559 F.2d 309, 310 (5th Cir. 1977).

governmental action is considered discretionary and the first prong is satisfied.

Garza v. United States, 161 F. App'x 341, 343 (5th Cir. 2005) (internal citation omitted). Second, the court must decide whether the complained of judgment or choice "is of the kind that the discretionary function exception was designed to shield" because the purpose of the exception "is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and public policy through the medium of an action in tort." Gaubert, 499 U.S. at 322-23 (internal quotation marks and citations omitted). This Court has written that for this prong, "the appropriate inquiry is whether the act in question is susceptible to policy analysis." Baldassaro v. United States, 64 F.3d 206, 211 (5th Cir. 1995) (internal citation omitted).

As already noted, in the proceedings below, the district court granted the Government's motion to dismiss pursuant to Rule 12(b)(1). While the district court stated that the aforementioned "law enforcement provision" of § 2680(h) applied to Castro's assault, abuse of process, and false imprisonment claims, the court ultimately concluded that it lacked subject matter jurisdiction because her FTCA claims could not survive the discretionary function exception. The district judge first determined that the first prong of the Gaubert test was satisfied because the Border Patrol Agents' actions were the product of judgment or choice. In reaching that determination, she highlighted that Castro failed to obtain a custody order granting her custody of R.M.G., and because of that, she placed the Agents in a "difficult situation"—namely, they had to either forcibly remove R.M.G. from Gallardo's custody even though there was no court order directing them to do so, or let Gallardo continue with possession of R.M.G., even though Gallardo was being repatriated to Mexico. After concluding that there were no statutes, regulations, or policies mandating that the Agents take a

certain course of action in this situation[5] and rejecting Castro's argument that the Agents had made an unauthorized custody determination as to R.M.G., the district judge concluded that the Agents "were left to make a difficult decision, one that was a product of judgment or choice . . . ." She also held that the Border Patrol Agents' actions satisfied the second prong of the Gaubert test because their "decision was unequivocally subject to policy analysis, as it involved the use of government resources and necessarily involved a decision as to what the Border Patrol should do with a United States citizen child in the unique circumstances presented by such a case." See, e.g., Baum v. United States, 986 F.2d 716, 724 (4th Cir. 1993) (a decision as to the best allocation or use of resources is "inherently bound up in considerations of economic and political policy, and accordingly is precisely the type of governmental decision that Congress intended to insulate from judicial second-guessing . . . .").

On appeal, Castro argues that the district court unduly narrowed the coverage of the FTCA by improperly expanding the scope of the discretionary function exception. She contends that the district court wrongly interpreted and applied the holdings of Gaubert and related precedent, because, while the Border Patrol Agents' actions were the product of choice or judgment, their actions not only exceeded the scope of their authority, but also violated the federal Constitution. Further, according to Castro, the Agents' actions lacked any connection to the social or economic policy of the regulatory regime that establishes the authority of the Border Patrol. The Government urges this court to affirm the district court's determination, contending that the Agents' actions in this case are clearly covered by the discretionary function exception of the FTCA. It argues that the district court properly applied Gaubert, and that its

---

[5] The Government submitted evidence before the district court that: "there are no policies, rules or statutes governing the apprehension and detention of a foreign national in lawful custody of his or her U.S. juvenile child . . . ." Castro does not disagree with that assessment.

judgment dismissing Castro's FTCA claims for lack of subject matter jurisdiction should be affirmed.

We first observe that we agree with the district court that the law enforcement proviso applies to some of Castro's FTCA claims since Border Patrol Agents are federal law enforcement officers for purposes of the FTCA. See Ysasi v. Rivkind, 856 F.2d 1520, 1524-25 (Fed. Cir. 1988) (explaining that Border Patrol Agents are federal law enforcement officers for the purposes of the FTCA). However, we disagree with the lower court's conclusions regarding the discretionary function exception. Even though an argument can be made that the district court properly analyzed the two Gaubert factors, that court erred by not first considering whether the Border Patrol Agents exceeded the scope of their authority. In Sutton, we explained: "[W]e have not hesitated to conclude that such action does not fall within the discretionary function exception of § 2680(a) when governmental agents exceed the scope of their authority as designated by statute or the Constitution." 819 F.2d at 1293. This principle of law has been recognized by a majority of other circuits as well. See, e.g., Raz v. United States, 343 F.3d 945, 948 (8th Cir. 2003) ("We must also conclude that the FBI's alleged surveillance activities fall outside the FTCA's discretionary-function exception because [plaintiff] alleged they were conducted in violation of his First and Fourth Amendment rights."); Medina v. United States, 259 F.3d 220, 225 (4th Cir. 2001) (noting that the starting point of analysis is that "federal officials do not possess discretion to violate constitutional rights or federal statutes" (quoting United States Fid. & Guar. Co. v. United States, 837 F.2d 116, 120 (3d Cir. 1988)); Nurse v. United States, 226 F.3d 996, 1002 (9th Cir. 2000) (holding the Constitution limits the discretion of federal officials such that the discretionary function exception will not apply); Prisco v. Talty, 993 F.2d 21, 26 n.14 (3d Cir. 1993) (concluding that the discretionary function exception was inapplicable to an FTCA claim based on conduct that violated plaintiff's

constitutional rights); Red Lake Band of Chippewa Indians v. United States, 800 F.2d 1187, 1196 (D.C. Cir. 1986) ("A corollary to these principles, and our basis for affirming the district court's holding on this issue, is that a decision cannot be shielded from liability if the decisionmaker is acting without actual authority. . . . An employee of the government acting beyond his authority is not exercising the sort of discretion the discretionary function exception was enacted to protect."); Birnmaum v. United States, 588 F.2d 319, 329 (2d Cir. 1978) ("A discretionary function can derive only from properly delegated authority. Authority generally stems from a statute or regulation, or at least from a jurisdictional grant that brings the discretionary function within the competence of the agency. Discretion may be as elastic as a rubber-band, but it, too, has a breaking point. An act that is clearly outside the authority delegated cannot be considered as an abuse of discretion." (internal quotation marks and citations omitted)); but see Kiiskila v. United States, 466 F.2d 626, 627-28 (7th Cir. 1972) (holding that conduct by commanding officer of military base, although "constitutionally repugnant," fell within the discretionary function exception).

Admittedly, this court and others have been less than clear about where this "scope of authority" analysis fits within the Gaubert factors: arguably some courts have treated it as a prerequisite, see, e.g., Nurse, 226 F.3d at 1001-02, while others have seemingly integrated it into the first Gaubert factor. See, e.g., McElroy v. United States, 861 F. Supp. 585, 593 (W.D. Tex. 1994). Nevertheless, it is overwhelmingly clear that, as the First Circuit has written, "courts have read the Supreme Court's discretionary function cases as denying protection to actions that are unauthorized because they are unconstitutional, proscribed by statute, or exceed the scope of an official's authority." Thames Shipyard & Repair Co. v. United States, 350 F.3d 247, 254 (1st Cir. 2003) (internal citations omitted). Because the Constitution can limit the discretion of federal officials

such that the FTCA's discretionary function exception will not apply, if the Agents acted in violation of R.M.G.'s constitutional rights, and therefore outside their scope of authority, that conclusion would eclipse the district court's analysis under the Gaubert framework.

We now turn to consider whether Castro sufficiently alleged that the Border Patrol Agents violated the scope of their authority here. In her complaint, Castro states that the Agents violated R.M.G's Fourth and Fifth Amendment rights when they detained her in immigration custody with Gallardo and his relatives even though they knew she was a U.S. citizen, and that such actions not only went beyond the scope of their authority, but also violated the constitution.[6] While it is well-recognized that violations of constitutional mandates are not actionable under the FTCA, see Meyer, 510 U.S. at 478 ("The United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims."), the occurrence of such a violation would involve the performance of a non-discretionary function for jurisdictional purposes, if the constitutional tort is also cognizable as an intentional tort under state law. As a federal district court explained:

> [A] court must determine whether there is a specific and intelligible constitutional mandate that involves or is related to the alleged intentional torts of the accused officer(s). If such a mandate exists, the Court will conclude, for jurisdictional purposes only, that the alleged torts occurred during the performance of a non-discretionary function. Upon reaching such a conclusion, the Court may determine

---

[6] See, e.g., First Amended Complaint at paragraphs 36 ("despite Defendant's recognition of Plaintiff R.M.G.'s status as a U.S. citizen, Defendant United States intentionally, maliciously, and recklessly violated Plaintiffs' right to procedural due process guaranteed by the Fifth Amendment"), 69 (border officials "willfully detained R.M.G. without her consent or the consent of her U.S. citizen parent, and the detention was without legal authority or justification"), and 70 (once border officers "knew or should have known that R.M.G. was a U.S. citizen and that a U.S. citizen parent was present to take possession of her and did not release her, Defendant United States had no legal authority or justification to continue its detention of the child").

the merits of the section 2680(h) intentional tort claims under the applicable state tort law.

McElroy, 861 F. Supp. at 593-94. As the McElroy court recognized, "[t]he Gaubert test merely instructs the reviewing court to determine whether the alleged conduct 'involve[s]' mandatory compliance with a federal statute, regulation, or policy, not whether the statute, regulation, or policy was violated." Id. at 593 n.16; see also Garcia v. United States, 896 F. Supp. 467, 475-76 (E.D. Pa. 1995) ("Because we cannot at this point preclude the possibility that the inspectors' conduct was unconstitutional, we cannot hold that the challenged conduct falls within the discretionary function exception."). Accordingly, the issue before us is whether the complaint and any properly-considered facts could support a finding that the Border Patrol Agents' alleged conduct exceeded the scope of their statutory or constitutional authority, not determining whether such a violation actually occurred.

We hold that Castro's complaint does sufficiently allege that the Border Patrol Agents' actions exceeded the scope of their authority. The Border Patrol, officially called The Bureau of Customs and Border Protection, is an agency of the Department of Homeland Security, and is specifically included as a defined agency subject to the Immigration and Nationality Act of 1953 ("INA"), 8 U.S.C. § 1101 et seq. See 8 C.F.R. § 1.1. Fundamentally, the INA's scope is limited to regulating the entry of aliens as well as their detention, expulsion/removal, and naturalization. See, e.g., 8 U.S.C. § 1103(a)(1); 8 U.S.C. § 1101(a)(23). Within this statutory grant of authority, Border Patrol Agents have, inter alia, broad discretion in making determinations in matters such as the detention, parole, or deportation of foreign nationals illegally present in the United States. See, e.g., 8 U.S.C. § 1226; 8 C.F.R. §§ 236.1-236.7; INS v. Yueh-Shaio Yang, 519 U.S. 26, 30 (1996) (explaining the broad INS discretion in determining who, along a class of eligible aliens, may be granted relief from removal). However, the power

of Border Patrol Agents to detain U.S. citizens is quite limited. While Border Patrol Agents possess a general arrest authority for crimes committed in their presence, 8 U.S.C. § 1357(a)(5), generally speaking they do not have authority to arrest or detain U.S. citizens. See, e.g., United States v. Brigoni-Ponce, 422 U.S. 873, 884 (1975) (writing that the Fourth Amendment "forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens").

The Government makes two arguments for why the Agents were within their statutory grant of authority. First, it cites 8 C.F.R. § 240.25(b) which states that immigration officials "may attach to the granting of voluntary departure any conditions [they] deem[ ] necessary to ensure the alien's timely departure from the United States . . . ." The Government contends that this is simply all the Agents did here. Second, it cites 8 U.S.C. § 1103(a)(3) which provides that the Secretary of Homeland Security "shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter." The Government then relies on language from Gaubert to make the argument that the Agents' actions were all planning-level decisions that are covered by the discretionary function exception. See 499 U.S. at 323 ("Where Congress has delegated the authority to an independent agency or to the Executive Branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no doubt that planning-level decisions establishing programs are protected by the discretionary function exception, as is the promulgation of regulations by which the agencies are to carry out the programs.").

Both of these arguments are unavailing. The Government's first argument fails because, as Castro highlights, Gallardo was removed in December 2003

pursuant to the reinstatement of a prior order of removal and not by voluntary departure; therefore 8 C.F.R. § 240.25(b) is simply irrelevant. The Government's second argument is without merit because even though governmental actors have wide discretion to carry out their statutory and regulatory obligations, courts have never interpreted delegated authority so broadly as to infringe upon constitutionally-protected rights and freedoms. See, e.g., Hernandez v. Cremer, 913 F.2d 230, 237 (5th Cir. 1990) (explaining that courts should "construe narrowly all [Congressionally-]delegated powers that curtail or dilute [constitutional protections.]" (citing Kent v. Dulles, 357 U.S. 116, 129 (1958))). The Government's contention that 8 U.S.C. § 1103(3) could be interpreted so broadly as automatically to override R.M.G.'s Fourth Amendment right from unreasonable seizure or her Fifth Amendment right to due process is simply untenable.

We are cognizant of the challenging circumstances in which Border Patrol Agents undoubtedly often find themselves because of the complexities of immigration enforcement, and we agree with the district court that, particularly in this instance, they were faced with a "difficult situation."[7] As such, we emphasize the narrowness of our holding. Had the Border Patrol Agents not known R.M.G.'s citizenship status or if they had doubted Castro's assertions that R.M.G. was a U.S. citizen, their decision to detain the child with her father would likely not be intertwined with the constitutional strands that are prominent in this appeal of a 12(b)(1) dismissal for lack of subject matter jurisdiction. However, here the Agents concede that they knew R.M.G. was a U.S. citizen.

---

[7] Of course, while it is true that this entire situation could have been avoided had Castro obtained a custody order before the repatriation transport carrying Gallardo and R.M.G. left, ultimately Castro's actions are irrelevant in determining whether the Border Patrol Agents' actions are covered by the discretionary function exception.

Castro alleges a plausible set of facts supporting subject matter jurisdiction because based on her complaint, the Border Patrol Agents' actions in detaining R.M.G. implicate constitutional concerns and, therefore, may have been non-discretionary. We hold that the district court legally erred in concluding that the discretionary function exception to the FTCA deprived it of jurisdiction without first determining whether the Agents' conduct was outside their scope of authority.[8] We remand this case for the district court to consider in the first instance to what extent the alleged constitutional violations are cognizable under Castro's FTCA claims. We highlight that our holding is limited to the jurisdictional question presented on appeal; nothing we have written should be interpreted to speak to the merits of either Castro's allegations of constitutional violations or her FTCA claims.

## CONCLUSION

For the foregoing reasons, the judgment of the district court as to Castro's FTCA claims is REVERSED, and this case is REMANDED for proceedings not inconsistent with this opinion.

---

[8] Accordingly, we need not address Castro's argument that the Agents also exceeded their authority by making a de facto custody determination.

JERRY E. SMITH, Circuit Judge, dissenting:

And the king said, Bring me a sword. And they brought a sword before the king. And the king said, Divide the living child in two, and give half to the one, and half to the other. 1 Kings 3:24-25.

We face a situation at least as old as the one faced by King Solomon, and one requiring his wisdom: what to do when two parents claim a child. I am no Solomon, and neither is the majority. I do not know the right answer, if there is one, and neither do my able colleagues. It is not the job of the federal courts to make that choice or to second-guess the decision of those to whom the heavy responsibility is given.

For two reasons, I respectfully dissent. First, the majority fundamentally misunderstands sovereign immunity and the Federal Tort Claims Act ("FTCA"), falling for the alluring but empty belief that if something really unfortunate occurs, someone always must pay. Prodded by that misunderstanding, the majority eviscerates much of the discretionary function exception, holding that whenever a Border Patrol officer violates the ConstitutionSSeven if he has no reason to know he is doing soSShe necessarily acts beyond his discretion. The majority's approach subjects the United States to substantial liability that is neither authorized by statute nor compelled by precedent. Second, even under the majority's misguided theory, the United States should not be liable, because, under Castro's complaint, the Border Patrol agents did not violate R.M.G.'s constitutional rights or otherwise exceed their lawful authority.

I. The Majority Misunderstands Sovereign Immunity.

Because of sovereign immunity, matters of the federal fisc are left to the political branches unless the government has explicitly waived its immunity. See Truman v. United States, 26 F.3d 592, 594 (5th Cir. 1994). Under the FTCA, the United States has consented to certain types of suits, 28 U.S.C. § 1346(b), but the waiver of immunity is far from complete, and there are a number of exceptions, including the discretionary function exception, 28 U.S.C. § 2680(a), which denies subject-matter jurisdiction to the federal courts over a great deal

of potentially unlawful conduct.[1]  Likewise, consistently with the purposes and history of sovereign immunity, "the exceptions that do appear in the FTCA must be strictly construed in favor of the government."  Truman, 26 F.3d at 594 (citing Atorie Air, Inc. v. Fed. Aviation Admin., 942 F.2d 954, 958 (5th Cir. 1991)).  These basic principles of sovereign immunity are not contested.

The majority nonetheless cites dictum from Sutton v. United States, 819 F.2d 1289, 1293 (5th Cir. 1987), and opinions from other circuits, for the astoundingly broad proposition that the FTCA's discretionary function exception does not apply whenever a federal officialSSeven without good reason to knowSS violates someone's constitutional rights.  Nothing in Sutton, however, turned on whether a constitutional right was violated; the defendants did not plead any such violation.  See id. at 1291.  Rather, the case concerned the interplay between the discretionary function exception and the intentional tort exception's "law enforcement proviso,"[2] with the entire matter remanded "because [the district court] decided [it] on inadequate factual allegations which prevent[ed] us from evaluating the appellants' cause of action in light of the differing statutory policies" of the two exceptions.  Id. at 1292.

Thus, until now, Sutton's outlier and truncated musing that constitutional rights are somehow categorically outside of the discretionary function exception has not been the law of the Fifth Circuit.  It is, first and foremost, irreconcilably inconsistent with Supreme Court precedent.  For instance, it contravenes United States v. Gaubert, 499 U.S. 315, 322-23 (1991), which holds that the discretionary function bars federal jurisdiction to review a federal officer's conduct unless "a federal statute, regulation, or policy specifically prescribe[d] a course of action," provided that the decision was of the type that ought not be "second-guess[ed]" because it is "grounded in social, economic, and political policy . . . ."  The omission of "Constitution" from the Court's explicit list of sources that can create a "mandate" that nullifies the discretionary function exception should be

---

[1] The discretionary function exception bars "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

[2] 28 U.S.C. § 2680(h).  Castro does not allege that § 2680(h) has any bearing on this case.

dispositive here.

This obvious reading of Gaubert finds additional support in FDIC v. Meyer, 510 U.S. 471, 478 (1994), which says that "the United States simply has not rendered itself liable under § 1346(b) [i.e., the FTCA] for constitutional tort claims." If all violations of the federal constitution render the discretionary function exception inapt, Meyer is effectively voided. In sum, the majority's strained attempt to "eclipse the district court's analysis under the Gaubert framework" utterly fails.

It is difficult to conceive of a violation of a constitutional right that does not also give rise to a state cause of action. For instance, many violations of the Eighth Amendment by prison officials likely also constitute negligence under state law. Unconstitutional searches theoretically can be cognizable as trespass. Violations of the Third Amendment can be characterized as a trespass or an invasion of privacy. Until now, under Meyer, we lacked jurisdiction to consider these "constitutional tort claims."

Under the majority's framework, by a plaintiff's artful pleading, the United States can be liable whenever the Constitution is violated even though, under Meyer, the sovereign is not subject to liability for constitutional torts. The majority's two-step rubric would go like this: First, allege a constitutional violation, thereby avoiding the discretionary function exception. Second, plead a state cause of action that overlaps with that constitutional violation, then seek damages under that state cause of action. Voila! No more sovereign immunity.

Properly understood, however, federal sovereign immunity is more robust than that. In Santos v. United States, No. 05-60237, 2006 WL 1050512 (5th Cir. Apr. 21, 2006) (per curiam) (unpublished), we affirmed the dismissal of a prisoner's state law negligence claim that overlapped with his contention that the Eighth Amendment had been violated. The plaintiff argued that his negligence claims should go forward, despite the discretionary function exception, because "no one has discretion to violate another's constitutional rights." Id. at *3. We promptly rejected that argument, holding that

> an inmate may bring a[n] . . . action [under Bivens v. Six Unknown
> Agents of the Federal Bureau of Narcotics, 40 U.S. 388 (1971),]
> against individual officers for a[n] alleged constitutional violation,

20

but he may not bring an action against the United States, the [Bureau of Prisons, or its] officers in their official capacities as such claims are barred by the doctrine of sovereign immunity."

Id. (some alterations in original) (internal quotation omitted). Contrary to the reasoning in Santos, the majority's wholehearted invocation of Sutton's dictum reads much of the discretionary function exception out of the federal code.

Under the majority's view, the United States may be liable for conduct even where its officers cannot be. This turns Bivens on its head. In Meyer, 510 U.S. at 485, the Court explained that it had "implied a cause of action against federal officials in Bivens in part because a direct action against the Government was not available." In light of Meyer, it makes no sense to treat FTCA claims against the United States more liberally than we treat Bivens actions against individual federal officers, but that is exactly what the majority's holding means: Because of qualified immunity, Bivens at least requires that constitutional rights be "clearly established" before liability ensues against federal officers, see, e.g., Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), but the majority's novel liability scheme against the United States apparently does not so require, because it reverses the district court without even pointing to what clearly established rights could have been violated under the facts Castro pleaded.[3]

Even if the Border Patrol violated R.M.G.'s constitutional rights, it did not violate any clearly established right.[4] Thus, even assuming that we should nar

---

[3] The majority is confused on this point. Quoting a district court, it states that the constitutional mandate must be "specific and intelligible." It then summarily states that "[w]e hold that Castro's complaint does sufficiently allege that the Border Patrol Agents' actions exceeded the scope of their authority." The majority does not explain, however, how a reasonable agent could have known that his conduct was violating a "specific and intelligible" constitutional mandate when he was exercising his discretion.

[4] Castro alleges that R.M.G.'s clearly established Fourth Amendment right to be free from unreasonable seizure was violated, but it is not clearly established that leaving a minor with his parent, in the absence of any court order dictating otherwise, is an unreasonable seiz-

row the scope of the discretionary function exception so that it does not apply where the Constitution has been violatedSSa holding that would allow nearly every Bivens action also to be an action against the United States, contrary to MeyerSSthere has to be a limit.  Before subjecting the United States to suit, at a minimum we ought to require that the constitutional "mandate" be clearly established with particularity, something that cannot be shown here.[5]

## II.  No Constitutional or Statutory Rights Were Violated.

Even if one accepts the majority's erroneous understanding of sovereign immunity, the district court was correct to dismiss for lack of subject-matter jurisdiction, because no constitutional rights were violated.  The notion that the Border Patrol agents unconstitutionally "placed in custody" or "detained" R.M.G., a baby less than one year old, is false on its face.  We routinely allow parents to make decisions that affect their children's constitutional rights,[6] and it is not contested that Gallardo consented to R.M.G.'s being taken with him to the Border Patrol station, just as he consented to the baby's going with him to

---

[4] (...continued)
ure.

[5] The concern that constitutional rights at least be clearly established before the United States can be liable is in line with the direction taken in Nurse v. United States, 226 F.3d 996, 1002 n.2 (9th Cir. 2000), which expressly reserved the issue:  "[W]e do not make any decision regarding the level of specificity with which a constitutional proscription must be articulated in order to remove the discretion of a federal actor."

[6] Indeed, parents can consent to conduct that would otherwise constitute a violation of a child's core Fourth Amendment rights.  See, e.g., Roe v. Tex. Dep't of Protective & Regulatory Servs., 299 F.3d 395, 407-08 (5th Cir. 2002) (holding that a social worker must demonstrate probable cause and obtain a court order, obtain parental consent, or act under exigent circumstances to justify the visual body cavity search of a juvenile in the residence); Dubbs v. Head Start, Inc., 336 F.3d 1194, 1207 (10th Cir. 2003) (stating, in deciding whether a government program that gave children physical exams, which included blood tests and examination of genitalia, violated the Constitution, that "if the trier of fact concluded that the parents in this case, on behalf of their minor children, actually consented to the examinations, there would be no Fourth Amendment violation").

Mexico. This explicit parental consent means that R.M.G.'s constitutional rights were not violated.[7] Make no mistake, she was not arrested, detained, held in custody, or deportedSSshe was with her father and with his consent.

Castro also claims the agents acted beyond their statutory powers because the Border Patrol was never affirmatively authorized to allow non-citizen parents to consent to bringing their citizen children with them to detention centers and other countries by means of government deportation vehicles. This is equally unavailing, because the power to allow parents to consent to take their children with them is ancillary to the government's power to detain and deport.[8]

To make the matter straightforward, what if both of R.M.G.'s parents were illegal aliens? Would the Border Patrol be forbidden, by a statute or the Constitution, from allowing her parents to consent to take her to the detention center while they waited to be deported? Would the agents be forbidden to allow them to consent to carry her with them on the government transport vehicle to Mexico? To ask these questions is to answer them. Does anyone doubt that the Border Patrol is authorized, as part of its discretionary authority, to allow families to stay together while it detains and deports?

The question of what to do with a child who is an American citizen, when one or both parents are not, is part of how the Border Patrol implements our immigration regime's "general provisions," and such difficult decisions are exactly the type that "involv[e] the necessary element of choice and [are] grounded in the social, economic, or political goals of the statute" that the discretionary func-

---

[7] The majority accurately quotes paragraph 36 of the First Amended Complaint, but that paragraph says nothing to explain what alleged actions were taken in supposed violation of the Constitution. Accordingly, the issue is waived and was properly dismissed. See Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc., 200 F.3d 307, 316-17 (5th Cir. 2000) (noting that arguments raised for the first time on appeal will not be considered).

[8] Castro acknowledges some ancillary powers, such as the power to take R.M.G. to the station in a Border Patrol vehicle.

tion exception protects. Gaubert, 499 U.S. at 323. It seems that under the majority's view, the Border Patrol violates both constitutional and statutory law when it "detains" a citizen child along with the child's Mexican-national parents, especially when it permits the child's parents to take him with them to Mexico.

Likewise, if we accept the proposition that if Border Patrol agents make a custody determination, they act beyond their statutory authority, Castro's claim should still be dismissed, because the agents did not make a custody determination. Instead, they elected not to interfere with the status quo as R.M.G.'s parents had left it. If the government had forcibly taken R.M.G. and given her to Castro, that would be picking Castro over Gallardo; if Castro had R.M.G., and the government physically took R.M.G. and gave her to Gallardo, that would be picking him over Castro. Preserving the status quo, however, was not making a custody determination, but instead was merely respecting the parents' private ordering.[9]

In fact, it is the majority that now makes an ex post custody determination by establishing the rule that custody of a child born to an American citizen and an illegal alien is presumptively granted to the American-citizen parent. That may be a fine default rule, but it is not for a federal court of appeals to delve into family law, traditionally the exclusive province of the states.[10]

Furthermore, because this new custody rule does not actually affect Castro

---

[9] Nor did the government make a de facto custody determination, a doctrine recognized in another context in Suboh v. Dist. Attorney's Office, 298 F.3d 81 (1st Cir. 2002). The agents had to do something with R.M.G.; they called the Texas Department of Family and Protective Services, which responded that it "would not get involved," because R.M.G. was not being abused. The majority acknowledges the dilemma the agents faced.

[10] See Ex parte Burrus, 136 U.S. 586, 593-94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States."); see also Ankenbrandt v. Richards, 504 U.S. 689, 703 (1992) ("We conclude, therefore, that the domestic relations exception, as articulated by this Court since Barber [v. Barber, 62 U.S. 582 (1858)], divests the federal courts of power to issue divorce, alimony, and child custody decrees.").

but will affect prospective custody determinations, it is more akin to a policy. And when state custody law is silent, the relevant state agency says it will not get involved, and the Border Patrol is confronted with a custody matter and decides to retain the status quo as the parents left it, it is not the role of the federal courts to second-guess and decide which policy is best. Castro alleges the Border Patrol acted without authority and rendered a de facto custody determination, but in fact it is the majority that acts without authority and announces a de jure custody policy.

The agents were faced with the following unfortunate situation: Gallardo was detained; Castro had left the home days before; R.M.G., a baby, could not be left alone; Gallardo wanted R.M.G. to go with him; Gallardo had legal right to R.M.G., and no court order had deprived Gallardo of that right; Castro also wanted to take the child, but she had no court order and thus no superior right; Texas officials expressly said that the state would not take R.M.G., because she was not being abused; Texas law is opaque on what to do when two parents with equal right disagree about where a child should live, but the better reading of Texas law is that the parent with possession is authorized to choose[11]; Gallardo had actual possession of R.M.G., and he wanted her to go with him to Mexico.

In this difficult dilemma, the agents did the best that they could, and the choice they made was the one that least enmeshed the federal government in state custody issues. It is hard to imagine a more appropriate case for invoking the discretionary function exception.

---

[11] Castro repeatedly refers to Holley v. Adams, 544 S.W.2d 367 (Tex. 1976), which states the factors that Texas courts consider in deciding custody and which does not expressly include, as a factor, which parent has actual possession. From this Castro argues that possession does not matter under Texas law.

This misses something important. Without first obtaining a court order, the parent seeking custody cannot call the police and require them to transfer possession of the child. In other words, in the absence of an order, Texas does recognize the status quo, at least as to whether the formal power of the state will be exercised.

25

### III. Conclusion.

No one is pleased that Castro did not see her daughter for three years,[12] but as a legal matter, the discretionary function exception applies. The first prong of Gaubert was satisfied, because the Border Patrol agents' decisions were "the product of judgment or choice." Gaubert, 499 U.S. at 322. The choices made, moreover, were constitutional, because R.M.G. was neither unlawfully detained nor deported, but instead was properly held by her father's consent. The second prong of Gaubert was also satisfied, because the agents' decisions were not of the sort that should be "second-guess[ed]," id. at 323, given that the question of what to do with a citizen child when the parent with possession is deported, and state and federal law are silent, is a policy matter best left to the agency. Faced with a bad situation, the agents decided to retain the status quo as between the parents.

Because the district court was correct to dismiss for lack of subject-matter jurisdiction based on the discretionary function exception, I respectfully dissent.

---

[12] If the Border Patrol agents had taken possession from Gallardo, the facts would have been hard, too; it is unfair to a father to say that he must leave his daughter merely because his wife is a citizen and he is not. Faced with a Solomon-splitting-the-baby situation, the agents decided to leave matters as the parents had left them.