## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-20607

United States Court of Appeals
Fifth Circuit

**FILED**
October 9, 2018

Lyle W. Cayce
Clerk

SURESHOT GOLF VENTURES, INCORPORATED,

Plaintiff - Appellant

v.

TOPGOLF INTERNATIONAL, INCORPORATED,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CV-127

Before STEWART, Chief Judge, and WIENER and HIGGINSON, Circuit Judges.

PER CURIAM:*

Sureshot Golf Ventures, Inc. ("SureShot") appeals the dismissal of its various antitrust claims stemming from Topgolf International, Inc.'s ("Topgolf") acquisition of Protracer, a Swedish producer of innovative golf-ball-tracking technology. The district court held that SureShot's claims were not ripe for review and that SureShot lacked antitrust standing because it failed

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-20607

to allege antitrust injury. For the reasons set out below, we AFFIRM the district court's judgment as MODIFIED to reflect a dismissal without prejudice.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Topgolf was founded in 2000 and operates golf entertainment centers in the United States and abroad. Topgolf combines driving ranges, where golfers hit golf balls at outdoor targets, with food and beverage service, golf services, entertainment, and other amenities. Using Topgolf's proprietary ball-tracking technology, golfers learn how far they hit a shot and are allocated points based on distance and accuracy.

SureShot, a Texas corporation, was formed in 2014 with the hopes of competing with Topgolf's entertainment centers by opening high-end, premier golf entertainment facilities. SureShot took a different approach to the "sports-bar-type entertainment facility" mastered by Topgolf and sought to create a distinct golfing experience using high-speed video cameras and software that track balls in flight and create "a unique, immersive Three Dimensional (3-D) ball flight and gaming experience." SureShot hoped that its new golf experience would lure customers away from Topgolf and reduce Topgolf's market share, "thus reducing or eliminating Topgolf's ability to set monopoly prices." SureShot's founders, Bob and Bryan Peebler, invested significant time and resources into developing SureShot's business model, including by, *inter alia*, entering important contracts for licensing supplies, facilities, support, and technology.

To create real competition with Topgolf, SureShot relied on ball-tracking technology developed by Protracer as the primary feature of its business. Protracer developed technology capable of both tracking the flight of multiple golf balls and displaying, with graphics, the ball's flight in near real time on a television monitor. In 2012, Protracer launched the Protracer Range System,

2

No. 17-20607

"the only technology on the market that actively tracks and analyzes every shot hit on a driving range across an entire field of vision, significantly enhancing a golfer's practice session" or game experience. Protracer also developed a turn-key system for managing and maintaining a ball-tracking system across a large-scale driving range facility, *i.e.*, across more than 100 hitting bays, which is the scale of a golf entertainment center. Because of the Protracer system's unique capabilities, SureShot expended substantial time, effort, and resources to qualify the Protracer system for use in its business, and Protracer made several improvements to ensure the product met SureShot's specific business requirements.

SureShot and Protracer entered into a Frame Agreement for the Supply of License, Support and Maintenance of Professional Services (the "Frame Agreement") on April 17, 2015. The initial term of the agreement was five years, expiring in 2020. Pursuant to the Frame Agreement, Protracer contracted to supply the ball-tracking technology and to support and maintain the system in up to 500 bays in up to five facilities each year during the Initial Term, with a maximum commitment of 1600 bays, or 16 facilities. Protracer's obligations under the support and maintenance provisions of the Frame Agreement gave Protracer access to SureShot's facilities and other "sensitive, proprietary, and nonpublic confidential information." SureShot also alleges that Protracer intended to "stay neutral as a tracking provider" for golf entertainment facilities and would not enter into exclusive dealing contracts with SureShot or others.

However, in 2016, "Topgolf used its position as a monopolist to acquire Protracer." SureShot alleges the Topgolf-Protracer acquisition was made with the "intent to foreclose the market to SureShot and other competitors." After Topgolf's acquisition, SureShot's owners met with Topgolf executives in Houston, seeking assurances that the Protracer Range System would remain

3

No. 17-20607

available after the initial five-year term of the Frame Agreement and that the acquisition would not result in a de facto exclusivity agreement with respect to any direct competitor. Topgolf refused to provide SureShot assurances of continued access to the Protracer Range System beyond the expiration of the Frame Agreement, and one of Topgolf's executives stated, "If I was in your position, I would look for alternatives." According to SureShot, Topgolf's representations during and after this meeting made it "obvious that Topgolf had no intention of allowing competition because the very purpose of its Protracer acquisition was to squelch competition." Although the Frame Agreement remains intact, SureShot alleges that Topgolf's control of the technology effectively eliminated the Protracer system as a viable option for SureShot's future needs and deprived SureShot of a competitive opportunity to enter the interactive virtual golf market.

SureShot filed its complaint on January 17, 2017, alleging several federal antitrust claims: conspiracy in restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1; monopolization and attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2; and unlawful acquisition under Section 7 of the Clayton Act, 15 U.S.C. § 18. SureShot sought a judicial declaration that Topgolf's actions violated federal antitrust laws and an award of treble damages. Topgolf subsequently sought to dismiss SureShot's complaint for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). In short, Topgolf argued that SureShot's claims, which stemmed from "SureShot's fear that Topgolf [would] decline to renew or extend SureShot's license to the Protracer Range System when the current service contract expires in 2020," were not ripe for resolution because SureShot continued to have access to the ball-tracking system. Topgolf also argued that SureShot did not adequately allege that Topgolf's acquisition was illegal or resulted in anticompetitive effects.

4

Specifically, Topgolf contended that SureShot had not been denied access to an "essential facility" necessary for its Sherman Act claims, that the acquisition did not threaten competition, and that SureShot had not plausibly pled a relevant market as required under federal antitrust law.

SureShot filed a response, arguing that the facts alleged in its complaint adequately state a claim for relief under the Sherman Act and the Clayton Act. SureShot emphasized that Topgolf's intent in acquiring the Protracer Range System—which was different from the proprietary technology developed and used at Topgolf's golf entertainment facilities—was to foreclose competition, and that this intent violated antitrust laws. SureShot also challenged the proposition that it failed to allege a relevant product market, arguing that its allegations that Topgolf was a player in the "golf entertainment market" were legally adequate at the pleading stage. Topgolf filed a reply memorandum, reiterating its jurisdictional and substantive objections to SureShot's claims.

The district court granted Topgolf's motion to dismiss, holding that SureShot's claims were not ripe for consideration under Article III and that SureShot failed to plead antitrust injury sufficient to confer antitrust standing. The district court accepted Topgolf's argument that SureShot failed to allege that it was in fact denied access to the Protracer technology. Because of this, the district court found that "SureShot's perceived threats of monopolistic behavior [were] speculative and [did] not confer standing." The district court also held that SureShot lacked antitrust standing because it suffered no "antitrust injury." That is, according to the district court, SureShot failed to plead that Topgolf's actions harmed competition within the relevant market and not merely SureShot's competitive advantage. The district court did not address the plausibility of SureShot's substantive claims. The district court

No. 17-20607

dismissed SureShot's claims with prejudice on September 5, 2017,[1] and SureShot filed a notice of appeal on September 25, 2017.

## II. DISCUSSION

The two issues on appeal are (1) whether SureShot's claims against Topgolf were ripe for consideration, and (2) whether SureShot alleged a cognizable antitrust injury.

A. Standard of Review

SureShot challenges the district court's Rule 12(b)(1) dismissal of its claims against Topgolf. This court reviews the grant of a motion to dismiss for lack of jurisdiction de novo. *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012); *see also Jebaco, Inc. v. Harrah's Operating Co., Inc.*, 587 F.3d 314, 318 (5th Cir. 2009) ("We review *de novo* motions to dismiss . . . ."). SureShot bears the burden of establishing subject-matter jurisdiction. *Castro v. United States,* 560 F.3d 381, 386 (5th Cir. 2009), *vacated on other grounds,* 608 F.3d 266 (5th Cir. 2010).

Under Rule 12(b)(1), a claim is "properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate" the claim. *In re FEMA*, 668 F.3d at 286 (quoting *Home Builders Ass'n, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal citation omitted)). The court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits, and lack of subject-matter jurisdiction may be found in the complaint alone. *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001) (per curiam). A motion to dismiss for lack of subject-matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claims entitling him to

---

[1] The parties do not raise on appeal arguments related to SureShot's substantive claims except as necessary to address the jurisdictional issues.

6

relief. *Wagstaff v. U.S. Dep't of Educ.,* 509 F.3d 661, 663 (5th Cir. 2007) (per curiam).

      B. Ripeness

          *1. Applicable Law*

      This court reviews the jurisdictional issue of ripeness de novo. *See Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012). "As the party asserting federal jurisdiction," SureShot has "the burden of demonstrating that jurisdiction is proper." *Stockman v. FEC*, 138 F.3d 144, 151 (5th Cir. 1998). Under Article III of the Constitution, federal courts are confined to adjudicating "cases" and "controversies." *Choice Inc. of Tex.*, 691 F.3d at 714–15. To be a case or controversy for Article III jurisdictional purposes, the litigation "must be ripe for decision, meaning that it must not be premature or speculative." *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002); *see also Choice Inc. of Tex.*, 691 F.3d at 715 ("The justiciability doctrines of standing, mootness, political question, and ripeness 'all originate in Article III's 'case' or 'controversy' language . . . .'" (omission in original) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006))). In other words, "ripeness is a constitutional prerequisite to the exercise of jurisdiction." *Shields*, 289 F.3d at 835.

      This court has previously set forth the prevailing standards for determining whether a dispute is ripe for adjudication:

> A court should dismiss a case for lack of "ripeness" when the case is abstract or hypothetical. The key considerations are "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required.

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586–87 (5th Cir. 1987) (internal citations omitted).

### 2. Analysis

SureShot preliminarily argues that the district court failed to credit the allegations in its complaint as true, and this misconstruction of SureShot's pleading led the court to its erroneous ripeness decision. According to SureShot, the district court should have taken the Topgolf executive's statement about seeking alternatives to the Protracer Range System as an immediate denial of future access to the technology and should not have determined for itself that the statement was not severe enough to qualify as denial of access.

SureShot maintains that, contrary to the district court's opinion, SureShot adequately alleged that the anticompetitive actions forming the basis of its complaint had occurred at the time this lawsuit was filed, and therefore its claims were ripe. SureShot emphasizes that the district court mischaracterized SureShot's antitrust claim as a complaint about a future contractual decision and that its case should make it beyond the motion to dismiss stage. SureShot also cites various pages in its complaint which SureShot contends adequately allege it was forced to cease operations because of the Topgolf-Protracer acquisition.

The district court interpreted SureShot's complaint to allege that Topgolf might, in the future, deny SureShot a license to use the Protracer ball-tracking system in its business. On this basis, the district court held that SureShot's claims were not ripe. On appeal, SureShot argues that its complaint "is littered with references to it ceasing operations" of its golf entertainment business because of the Topgolf-Protracer acquisition and Topgolf's subsequent refusal to provide assurances that the ball-tracking technology at the core of SureShot's business model would be available in the future. In support, SureShot specifically identifies the following record citations from its complaint:

No. 17-20607

- Topgolf "eliminated SureShot's competitive value proposition" and Topgolf's "anticompetitive behavior eliminates the public's choice of golf entertainment experiences."
- "Topgolf used its market power to foreclose SureShot from entering the market by effectively cutting off the supply to SureShot of the unique, leading-edge Protracer technology upon which the SureShot model was built and based."
- "Under those circumstances, continuing to license and use Protracer technology was not a viable option . . ." and referencing advantages Topgolf would enjoy "[w]ith SureShot out of the way . . . .".

The above-cited provisions from SureShot's complaint are ambiguous about the nature and immediacy of SureShot's injury, and the remainder of its complaint reads in hypotheticals and future threatened injury. In *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), the plaintiffs challenged the constitutionality of a federal surveillance program but could not show that the government would "imminently" surveil them. *Id.* at 411. Because government surveillance of the plaintiffs was not "certainly impending," they lacked standing. *Id.* at 414. Undeterred, the plaintiffs argued that they had taken reasonable precautions "to avoid [the challenged] surveillance" and had thereby "suffer[ed] present costs and burdens that are based on a fear of surveillance." *Id.* at 415–16. The Supreme Court firmly rejected that argument, ruling that plaintiffs "cannot manufacture standing" by "incur[ring] certain costs," even "as a reasonable reaction to a risk of harm." *Id.* at 416.

Similarly, SureShot's alleged injury is not "certainly impending." The complaint does not allege that the SureShot-Protracer Frame Agreement included an option to renew,[2] nor does it allege that Topgolf unequivocally

---

[2] As such, this court does not analyze the cases cited by Topgolf and the district court, *Middle S. Energy, Inc. v. City of New Orleans*, 800 F.2d 488 (5th Cir. 1986) and *Destec Energy, Inc. v. S. Cal. Gas Co.*, 5 F. Supp. 2d 433 (S.D. Tex. 1997), for the conclusion that a claim against a party for exercising an option is not ripe until the option is actually exercised.

No. 17-20607

stated it would not extend the Frame Agreement beyond 2020. The closest Topgolf came to denying future use of the Protracer technology was the statement of its unnamed top executive who advised SureShot to seek alternative ball-tracking technology in developing its business, which did not immediately terminate the SureShot-Protracer agreement.

SureShot's claims of market foreclosure stemming from the Topgolf-Protracer acquisition are similarly speculative. SureShot alleges that Topgolf's acquisition of the Protracer Range System would "cut off the supply to SureShot of the unique, leading-edge Protracer technology," give Topgolf control over licensing agreements, and authorize it to extend agreements to businesses interested in using the Protracer technology to open businesses other than golf entertainment facilities, thereby controlling prices and sending less qualified personnel for installation and service requests. However, all of the allegations SureShot identifies for us are phrased in future terms, and SureShot has not alleged that any of the federal antitrust violations have resulted in the above-referenced feared actions.[3]

### III.  CONCLUSION

Because the resolution of this case is based solely on lack of subject-matter jurisdiction, SureShot's claim is dismissed without prejudice. *See, e.g., Pillar Panama, S.A. v. DeLape*, 326 F. App'x 740, 745 (5th Cir. 2009); *Ramming*, 281 F.3d at 161. Accordingly, the district court's judgment is AFFIRMED as MODIFIED to reflect a dismissal without prejudice.

---

[3] Because the case is not ripe, we find it unnecessary to analyze whether SureShot alleged a cognizable antitrust injury as required for antitrust standing. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983) (stating antitrust standing supplements the Article III standing requirements).